# EXHIBIT 16

27 June 2014

To whom it may concern,

At around midday today, our rafting crew of 22, including 10 from the Chief Seattle Council, ~~and~~ 8 from the Chino, ~~area Scout~~ CA BSA Council, and 4 guides from Epley's Whitewater Adventures, arrived at "The Slide" rapid along the Salmon River. The rapid, to our knowledge, had been flowing at 2~~8~~,000 cfs. Before taking on the rapid, we pulled our boats to river left so that our guides ~~got the~~ were able to scout out the rapid and develop a plan. I, myself, accompanied the guides on the hike up to scout out "The Slide", a class 5 rapid. The guides briefed the rest of the crew, ~~informat~~ informing us that we would flow river left in the beginning of the rapid, but then drift towards the middle. We set out to face the rapid, flowing river left, and then as ~~the~~ our boat, which held Joe Kane, drifted towards the middle, we were hit head on by a towering wave, shoving ~~multiple~~ all of the passengers around. I, myself, was thrown back, almost falling off of the raft,

When the water had cleared, I looked back in the raft, (I was sitting on the portside bow) and saw that Mick Kane and his fath Joe Kane were no longer in the raft. Our boat, along with the other boats, immediately began rescue procedures. When Joe Kane floated by our raft, two of the guides threw out rope for him to grab on to, and yelled "Swimmer rope! Joe showed no response, and was floating opposite of the way that the guides had directed us. While we were told to float with our feet downstream, Joe was floating with his legs upstream, and his eyes were closed. When our raft was able to continue downstream, I saw that another raft had recovered Joe along the right shore and were carrying his limp body towards the raft. After floating a little further downstream we recovered Mick Kane along another shore, and secured him in our raft.

Respectfully Yours,
Chris Zantek          | Crew 1042, Chief Seattle Council

# EXHIBIT 17

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

The ESTATE OF JOSEPH R. KANE,          )

deceased; STACIE KANE, individually,   )

and as guardian of JOSEPH P. KANE;     )

and THOMAS KANE, individually,         )   Case No. 3:15-cv-00105-EJL

                    Plaintiffs,        )

vs.                                    )

EPLEY'S, INC., an Idaho corporation,   )

                    Defendant.         )

_____        )


DEPOSITION OF ALEXANDREA ESTES

NOVEMBER 8, 2015


REPORTED BY:


MONICA M. ARCHULETA, CSR NO. 471


NOTARY PUBLIC

Page 26

1  is where we don't want to be (indicating).  I'm not an
2  artist.
3      Q.  And I understand that.  I'm not asking you to
4  depict --
5      A.  I want to say when I am exiting --
6      Q.  Excuse me.  Let me interrupt you for just a
7  minute.  Which is down river?
8      A.  This is down river (indicating).
9      Q.  Put an arrow there.
10     A.  (Complying.)
11     Q.  Good.
12     A.  My boat squared up on the third wave.  Which
13  is this one.  But it should be more over here
14  (indicating).  This is the shore.  This is an eddy.
15  This is all rock formation that causes this eddy.  My
16  boat is squared up to this lateral, to the best of my
17  knowledge.  And then as we come up over the top we
18  proceed this way (indicating).  As we come up over the
19  top they fall in the water.
20     Q.  By "they" who do you mean?
21     A.  Joe and Mick.  And they end up in this eddy
22  (indicating).
23     Q.  In the GoPro video that you watched did you
24  hear the one individual say that he thought there were
25  three people maybe in the water and they went around

Page 27

1  that rock on the right side of the river, river right,
2  after they were thrown out?
3      A.  I did not hear that.  Three people out of my
4  boat?
5      Q.  No.  He just said he thought he saw three
6  helmets there.
7      A.  Oh.
8      Q.  And I'm just asking if you recall that?
9      A.  I don't, no.
10     Q.  The two Kanes came out of your boat.  Did you
11  see them get ejected out of the boat?
12     A.  I mean, it all happened very fast.
13     Q.  I understand that.
14     A.  But, yes, I saw them out of the boat.
15     Q.  Were they both sitting on the same side?
16     A.  Yes.
17     Q.  And you hit -- how many waves did you hit?
18  Did you hit two waves?
19     A.  Three.
20     Q.  And on which wave were they thrown out of the
21  boat?
22     A.  I believe it was the last wave.
23     Q.  How high were those waves would you estimate?
24     A.  I was in an 18-foot boat.  And I am pretty
25  close to vertical.  I mean, they had to be 18 to 20 feet

Page 28

1  waves.
2      Q.  What would you classify that if you were using
3  a common river classification of one through six?
4      A.  It was a classified rapid.
5      Q.  Once they were ejected from the boat what did
6  you attempt to do?
7      A.  Finish the rapid.  Make sure that I was
8  squared up to any additional waves.  And then I motioned
9  to Mike that I had swimmers by pointing river right.
10  And then Mike made a move river right.  There was no way
11  for me to position my boat to where they are.  So I made
12  a move to the right and joined Mike.
13     Q.  Could you see them in the water?
14     A.  Yes.
15     Q.  Did you at any time lose sight of them?
16     A.  Not until they were behind me.
17     Q.  Have you ever had experience swimming in white
18  water such as existed at the Slide on that particular
19  date?
20     A.  Yes.
21     Q.  How many times?
22     A.  Somewhere between -- I would say probably 30
23  to 40 times.
24     Q.  And what were the circumstances?  Were you
25  thrown out of a boat?

Page 29

1      A.  I have been thrown out of a boat.  I have
2  jumped out of a boat.  I have been flipped in a boat.  A
3  few of them training purposes.  We did a white water
4  rescue training course my first year there.  So we had
5  to swim through several rapids.  I mean, when we get off
6  work guides go out and we practice flipping boats and we
7  practice swimming through rapids.  It is what we do for
8  fun.  So I don't know exactly how many times.
9      Q.  At that time you were physically fit?
10     A.  Yes.
11     Q.  Did you work out regularly?
12     A.  Yes.
13     Q.  And what was your height and weight?
14     A.  Six-feet tall, 170.
15     Q.  And when you left to go down the river from
16  the Slide did you take into account the weight, fitness
17  level, these people's ability to follow directions, and
18  so forth, as part of your overall assessment of the
19  ability of how they would perform on a river?
20     A.  As a guide you always assess who you are
21  taking on the river.  So I would say yes.  Before we
22  launch we ask does anybody have any medical concerns we
23  need to know about.  Any shoulder injuries.  Any knee
24  injuries.  Anything we need to be aware of.  So we do
25  our best to take that into account.

Page 30

1    Q.  In this particular group how would you say
2  they were as far as fitness goes overall?
3    A.  I would say we had a very wide range of
4  fitness levels.  We had kind of two separate parties
5  within one Boy Scout troop.  We had a younger group that
6  was with -- I think his name was Mr. Lee.  A younger
7  group with him.  And then we had the Zanteks, and the
8  Naults, and the Kanes, and their kids.
9    Q.  Did the Naults or the Kanes appear to you to
10  be people who were -- particularly the two men -- well,
11  Mrs. Nault, for that matter, appear to be people who
12  were in good physical shape?
13    A.  No.
14    Q.  Did you take that into account as far as what
15  you were going to do when you got to the Slide?
16    A.  Yes.
17    Q.  Did you develop a plan for going through the
18  Slide?
19    A.  Yes.
20    Q.  And that was you were going to do the sneak
21  and stay river left?
22    A.  That was the option we chose; yes.
23    Q.  Did you give any thought or maybe think in
24  your own mind or do any planning as to what you were
25  going to do for a rescue if any of these people were

Page 31

1  ejected from the boat in classified waters?
2    A.  That is always a consideration in Class II
3  waters.
4    Q.  Did you have a plan in this case?  What you
5  were going to do if they got ejected?
6    A.  Yes.
7    Q.  Was it discussed among the guides?
8    A.  We discussed planning.  I mean, not in that
9  instance.
10    Q.  Did you develop a plan as you sat there and
11  scouted as to okay, as we are going to go through here
12  what are we going to do as far as safety is concerned --
13    A.  Yes.
14    Q.  -- for all of these guys if we have people go
15  out of the boat?
16    A.  Right.  That is why Mike went first.  And then
17  he positioned his boat -- in the video it looks like he
18  is a little bit river left, like he got caught in an
19  eddy line, to watch my boat go through so he could make
20  a move if I were to lose somebody out of my boat.  And
21  that is kind of the plan every time we go rafting.  The
22  first person that goes through a rapid waits for the
23  next boat to see if they have any swimmers.  And then
24  they wait for the next boat to see if they have any
25  swimmers.  We send the gear boat last.  Because if we

Page 32

1  miss people then they can pick up people along the way.
2    Q.  In this particular case, though, Mike was not
3  able to go river right; was he?  He was stuck on river
4  left, wasn't he, when your passengers were thrown out?
5    A.  Mike went river right.
6    Q.  He was not able to reach them, though; wasn't
7  he?
8    A.  Well, they fell out right below the rapid.
9  You can't raft upstream.
10    Q.  After they even washed out they weren't able
11  to reach them until quite a ways down the river; were
12  they?
13    A.  Mike?  Or the team?
14    Q.  Mike, for one.
15    A.  No.
16    Q.  And for the team who was able to reach them
17  first?
18    A.  Becca was rescuing Mrs. Nault.
19    Q.  And who was doing Mick and --
20    A.  Myself and Mike.
21    Q.  And how far down the river was it until you
22  could get to them?
23    A.  Until I got to whom?  Until I found who?
24    Q.  Until you found either Mick or Joe?
25    A.  And are you talking about me specifically?  Or

Page 33

1  the team?
2    Q.  You.
3    A.  Me, specifically?
4    Q.  Right.
5    A.  Well, Mick I see get washed out.  He is
6  floating downstream.  He is heading towards Becca.  And
7  I was like okay, Becca will grab him.  Where is Joe?
8  And my first thought is well, he has gone to shore.  So
9  we need to make sure we can get him offshore.  And then
10  I hear Mike yell, "Swimmer rope."  And that is the
11  phrase we use when you are throwing a throw rope for
12  somebody.  Then I see his orange life jacket floating,
13  so I know he doesn't have the rope.  And then I yell,
14  "Swimmer rope."  Because we are positioned on shore.
15  And I throw it across his chest.  He does not reach for
16  it or grab it.  That is when I realize he is
17  unconscious.  So we attempted to run down the shore a
18  ways.  Couldn't grab him.  Get in the boat.
19    Q.  When you say run down the shore.  Were you on
20  the shore at the time?
21    A.  We had parked the boat river right so that we
22  could throw ropes to get them back to the boats.  We
23  load the boats.  At this point I know Mick is
24  downstream.  And I know Joe is downstream.  Mike's boat
25  leaves before me.  Joe gets caught in an eddy river

# EXHIBIT 18



**Kane v. Epley's, Inc.**
Case No. 3:15-cv-00105-EJL

GoPro Video -
Exhibit 18 to Decl.
of P. Cronin in
Support of
Defendant's Motion
for Summary
Judgment e-filed on
1/29/16

Patrick J. Cronin
Attorney for Defendant
(509) 838-6131

*Winston & Cashatt*
L A W Y E R S

# EXHIBIT 19

1/2

6/27/14   7:20 PM Mountain time

To Whom it May Concern!

Today we floated the lower salmon river, starting near Eagle Creek. We had a detailed safety briefing from Miles, the 4th of 4 days. They went over what to do if washed out, river positions, hang on to your paddle, float feet down river etc. There were four boats 2- 18' boats w/ 7 passengers, 1 - 16' boat with 4 passengers and a gear boat with no passengers. Each boat had a guide person. Our group totalled 18 guests + 4 guides. The briefing of today did warn that we would be going through the Slide, a class V rapid. They estimated the flow rate as 23,000 cfs, but it was an estimate.

We floated the approximate 7 miles to the slide through Blue Canyon. Before attempting the slide, all boats stopped river left, and the Guides and many of the guests went up on viewed the slide from above after crossing a rockfall. The first boat was an 18' with Guide Mike, The second boat was an 18' with guide Alex, I was on the third boat with guide Becca and the fourth boat was the gear boat with Miles.

When we went over Slide rapids, our boat shifted down on the left side, throwing Mrs. Neault out of the boat. I was tossed left, the left front passenger was partially out and I pulled him back in. The rear passenger was kicking me, so I knew he was there (Andrew, Trop Zu…, China), We are focused on rescuing our person who was overboard, and I noticed the two 18' on River Right, with people on the bank. I noticed the gear boat up river. We were fighting to stay in contact with the Mrs. Neault, and drifted downstream trying to rescue her. We went through multiple rapids, areas

Attempted. We started to get close to her and then another paddler q2 floated coming by in a faster current so I threw a rescue rope to him and he grabbed it. I pulled him to the boat and the guide had him hang on for about 30 seconds while we attempted the second rescue, mrs. Neault self rescued on a beach (started it anyways) so Trevor Neault and I pulled Mick Kane into the boat. We checked for injuries, and we all backpaddled into a eddy and the guide went up river to Mrs. Neault. Checked on Mick again. He talked about how his Dad had gone over as well right after he held on so we looked for another paddler. When we were beached we kept looking but didn't see anyone but Andrew kept looking. We saw the other boat, who said Joe had been found. The guides (Alex came ashore with her boat) came up and helped Becca with my wife. We had others check on Mick, a little front and an guide Alex (bandages) and at that point Mike floated by and he said he was going out CPR obviously in progress. Since I knew Joe was the only one missing at that point based on the members of Alex's boats description, I assumed he was the individual being treated.

We floated out, by the time we floated about 10 minutes we saw the gear boat using a sat phone to notify 911. Since we had extra hands, I took over that duty, but was unable to get a connection. By the time we reached the Confluence, a good samaritan jet boat had left with Joe, Guide Alex, SM Chris (Troop 201) and 2 other Troop 201 people.

DN

We pulled over and scouted slide rapid on river left.
I ran the rapid the way I had planned running the line
I chose. After clearing the rapid, Mik and Joe in the eddy I saw
on river right just below slide (At this point, both were
conscious). Mike and I both eddied out on the right, below
Mik and Joe. Mik was first to get out of eddy and was washed
over to river left where Becca picked him up. By the
time Joe washed out, he had probably been out of the
boat for about 5 minutes. Mike had walked up shore
with a throw rope and threw it to try and get him.
He floated past it so I tried again about 20 yards
below. When he didn't reach for the rope or respond,
we knew he was unconscious. At this point, 2 scouts
and myself ran down the shore to try and grab him.
After not being able to reach him before going around
the bend, we got back in the boats to catch him.
Mike got to him first and was able to have his passenger
pull him into the boat. This is when CPR began. I
had seen that mike had Joe so I went down river to
make sure Becca had all of her passengers as well
as mik. We re-grouped and gathered everyone in an
eddy on the left about a 1/4 mile down. Next, mike
passed and I saw CPR was still in progress so
we loaded boats and followed. The satelite phone

did not recieve reception in the canyon so we had to make it to the confluence quickly. Miles, Becca and myself met up with Mike there where a Jet boater ~~was~~ ~~nice enough~~ was nice enough to give us a ride to Heller Bar. Chris Li (scout leader), Anthony, and Johnathan (Scouts), and myself continued CPR through the snake until we reached Heller. Once we made it to Heller bar medics arrived in probably 20-30 min followed by the life flight.

June 27, 2014

To Whom it may concern,

    I, Patricia Cox of 2235 S. Fern Apt. B Ontario, Ca. 91762 (909) 781-0251 was one of 7 passengers in the first boat of Ephys to go through Slide Rock. Mike ___ was the leader also in the boat. Our boat made it through the rapids okay, and we pulled into the eddy to check on the following boats. As the second boat was coming through we noticed 2 people come out into the rapids. Mike checked to see which way the ejected people where. Both of them were on the other side of the river so we went straight across to pick-up people out of the water. One of the water people (Nick) went across and was picked-up. The other water person (Joe) was coming our way with his feet forward on his back. I believe it was Mike who threw him the rescue rope.

Page 143

pg. 2  P. Cox

The rope landed right to him but he was unresponsive so nothing happened. Anthony Li and Jonathan Perry tried to run along shore to catch him but the land was rocky and they couldn't catch him. They ran back and jumped into the boat and we took off after Joe. Joe had floated around an outcropping of rocks. We ~~paddled~~ paddled hard and caught up with him. ~~He was still~~ on his back with his feet forward. We got him over to the rocks and Chris Li, Anthony Li, Mike ____, Jonathan Perry, all pulled him up onto the rocks and immediately started CPR. The rocks were uneven so Mike said to pull him onto the dry bags. We all put effort into pulling him onto the bags; Joe being around 300 lbs, made it extremely hard. Everyone got into the boat quickly for Mike said we must move to get reception for 911. Chris Li, Anthony Li and Jonathan Perry

pg.3

work continually on Joe with CPR. We pulled his head back so ~~to~~ ~~he~~ he could get a clear breathing path. I held his head back while the 3 kept up ~~with~~ with the CPR. He was ~~was~~ unresonsive but the 3 kept up the CPR. We saw another boat at the conjunction of the river and they had a signal. It was decided that they would take Joe to get help. So Chris Li, Anthony Li, Jonathan Perry, ~~an~~ Mark Cox and another guy from the other boat lifted Joe onto the other boat. Chris, Anthony, and Jonathan all went with the boat to continue CPR. The guide Alex went also. The other boat left.

Patricia Cox
Patricia Cox

27 Jun 14

To whom it may concern,

Today's tragic event started with the usual trip planning and safety briefing in the morning prior to departing camp near Eagle Creek. We arrived upriver of the slide around noon to scout out the rapids. All guides and some rafters ascended the rocks to the overlook to view and discuss execution of float. The river speeds were believed to be just under maximum safe levels based on earlier reports in week. Prior to launch, rafters were advised on expectations with further safety briefings. My boat (18') included guide Alex and 7 paddlers including Joe Kane. Joe Kane was seated right side far back behind his son Mick, right side had 3 strong paddlers, left had 4 paddlers. Initially in the slide as 2nd boat we were paddling and riding well. Towards end we hit a huge wave that knocked us hard apparently ejecting Joe & Mick Kane. I did not see them. I fell into the raft slightly backwards. We recovered quickly keeping our eye on two lost members. Mick Kane was spotted first floating down river & was recovered by 16' raft piloted by Becca. Joe Kane soon thereafter floated by unconscious and we were unable to retrieve him with throw rope. Mike's boat and crew from Boy Scout Troop 201 were able to recover Joe downriver and attempted CPR to no avail. Mick Kane was transferred to our boat shortly after. He was a bit shaken but not hurt. This was our fourth day on the river and I had confidence in our guides ability to navigate our rafts and appreciated their continued focus on safety — we always had lifejackets & helmets. I am truly saddened by this horrible accident

Ron Turley

Venturing Crew

6-27-14 Mike Cornforth

Last Night of camp was about 7 miles from Slide Rappel
An pack Boats Saffty talk stoped to scout Sled Rappel
I was First through and Eddyed out Allex was Next
Saw 2 People fall out of Boat on opeset side of current
crossed over to other side an Eddyed out saw Boat 3 Becca
Attempt Rescue current flushed her out Boat 4 Mike
Same flushed out I was moving up stream on foot w/ throw Bag
Saw Joe face up floating in current Edge and was up Response
attemped throw Bag on Target No Response 2nd throw Bag from
another Boat Next to mine ontarget No Response Cut Boat
Loose and went after Joe caught him in Next Eddy
Pulled him on Rocks to Begin CPR Chris was nere I was
on Rardo for Help Mikes was trying Sat Phone No Servce
loaded Joe on my Boat cotinue CPR Met a Jet Boat
Operator who had Rardo and tranfered Joe to there Boat
To meet EMS at Heller Bar

"To whom it may concern,

On June 27th at around noon, myself and the other guides eddied out to scout out The Slide rapid. We stood at the overlook and discussed the current and came to the conclusion that the safest route was on the left side of the largest waves. Mike (lead guide) went first, then Alex (boat with Joe King), then Becca, and then myself in the gear boat (no passengers on board) — I gave Becca about 25 seconds of lead on myself through the rapid. I entered the rapid on the left side, stern facing the left shore. Seconds before I hit the first wave, I saw 2 swimmers a the whereabouts of the swimmers, the second wave came an they were still in the main current. I hit the first wave, looked I tried to find them again. I saw that they Joe & Mick were in the large slow moving eddy on the right. I turned my boat so the ster faced river right and pulled as hard as I could into the large eddy as fast as possible. Upon entry to the eddy, I began rowing toward Mick and Joe and whistled twice on my Fox 40. They were facing away from me. The eddy has a large rock jutting ou from the shore, behind which Joe & Mick disappeared from view though not to my knowledge underwater yet. I yelled Joe's name and checked the main current for any sign of Mick or Joe and saw one ~~one~~ of them floating down. I waited another 30 seconds or so to see if one of them was still stuck and saw no sign of anyone. I decided that I likely had misse their entry into the main current due to the obtrusive rock and pulled into the main current to assist wherever I was needed, as I had the ~~sattelite~~ ~~the~~ phone in my boat. Moving down the current I saw Mike and his crew scrambling on the rocks and pulled into their eddy. They had Joe on the rocks and Chris Li was performing CPR, Mike was calling on his radio to all frequencies, and as soon as I had my boat tied off, I began dialing 911 on the sattelite phone to no avail. I continued dialing 911 for several seconds. when Mike had th scouts lift Joe's body into ~~the~~ his boat and he ~~pulled off~~

toward the confluence all the while having his crew perform CPR on the Joe. I began to row toward the confluence as well while dialing and redialing 911 to still empty airwaves. I handed off the sattelite phone to a member of Becca's boat (Dave) and rowed full-force to the confluence. When I arrived & tied off, they were loading Joe's body onto the Jet boat.

Miles Ranck V
208-353-3022

# EXHIBIT 20



```
******AUTO**MIXED ADC 300
631 5 MB 1.614                        000631
FREY BUCK
LISA SMITH
1200 5TH AVE STE 1900

SEATTLE, WA  98101-3135               25 pgs
```

# ATTENTION
## Confidential Information enclosed.
## To be viewed by authorized persons only.

# If you have questions regarding any information you have requested, please call the phone number on the enclosed invoice.

Health information is reproduced by HealthPort, a health information management outsourcing service.  Your healthcare provider contracts with HealthPort to process authorized requests for copies of health records.

Reproductions are made from the medical facility's original records.  The confidentiality of these records is protected by federal and state laws and regulations, including the Health Insurance Portability and Accountability Act (HIPAA).

If you requested items that are not maintained in the medical record, your request for those items was forwarded to the appropriate department and will be sent under separate cover.  Likewise, information that you asked to have delivered to another address is sent separately.

This package may or may not contain medical records, depending on what was requested and how it was processed.

You may not make any disclosure or use of these records without the permission of the individual who is the subject of the records.

STJOSEPH 00001

HealthPort
P.O. Box 409740
Atlanta, Georgia 30384-9740
Fed Tax ID 58 - 2659941
(770) 754 - 6000



**HealthPort.**
## INVOICE

**Invoice #:** 0164559349
**Date:** 3/16/2015
**Customer #:** 1885003

| Ship to: | Bill to: | Records from: |
|---|---|---|
| LISA SMITH<br>FREY BUCK<br>1200 5TH AVE<br>STE 1900<br>SEATTLE, WA 98101-3135 | LISA SMITH<br>FREY BUCK<br>1200 5TH AVE<br>STE 1900<br>SEATTLE, WA 98101-3135 | ST JOSEPHS REGIONAL MED CTR<br>415 6TH ST<br>LEWISTON, ID 83501 |

**Requested By:** FREY BUCK
**Patient Name:** KANE JOSEPH RUSSELL

**SSN:** *****8353
**DOB:** 021464

| Description | Quantity | Unit Price | Amount |
|---|---|---|---|
| Basic Fee | | | 22.66 |
| Retrieval Fee | | | 0.00 |
| Per Page Copy (Paper) 1 | 20 | 1.24 | 24.80 |
| Shipping | | | 1.82 |
| Subtotal | | | 49.28 |
| Sales Tax | | | 4.68 |
| Invoice Total | | | 53.96 |
| Balance Due | | | 53.96 |

**Pay your invoice online at www.HealthPortPay.com**

Terms: Net 30 days

**Please remit this amount : $ 53.96 (USD)**

✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HealthPort
P.O. Box 409740
Atlanta, Georgia 30384-9740
Fed Tax ID 58 - 2659941
(770) 754 - 6000

| Invoice #: 0164559349 |
|---|
| Check # _____ |
| Payment Amount $_____ |

## Please return stub with payment.
Please include invoice number on check.
To pay invoice online, please go to **www.HealthPortPay.com** or call (770) 754 6000.
Email questions to Collections@healthport.com.

STJOSEPH 00002



# FREY BUCK P.S.

February 26, 2015

Records Custodian
St. Joseph Regional Medical Center
415 Sixth Street
P.O. Box 816
Lewiston, ID 83501

RE:  Joseph Russell Kane
     DOB:          1964
     SSN No.:        -8353

Dear Records Custodian:

This firm represents Stacie Kane as Personal Representative of the Estate of Joseph R. Kane. Enclosed is an Authorization for Release of Health Care Information signed by Stacie Kane. Also enclosed is the Notice of Appointment of Stacie L. Kane as the administrator of the Estate of Joseph R. Kane.

Please forward a copy of all records concerning Joseph Russell Kane including medical records, x-rays, imaging reports, laboratory reports and medical bills at your earliest opportunity.

If you will include an invoice for copy charges, we will promptly remit payment. If pre-payment is required, please e-mail an invoice to my attention at (lsmith@freybuck.com) and we will remit advance payment in full.

Sincerely,

**FREY BUCK, P.S.**

Lisa Smith
Paralegal

lls
Enclosure

## HIPAA COMPLIANT AUTHORIZATION FOR RELEASE OF HEALTH CARE INFORMATION

Patient Name:    Joseph Russell Kane        Date of Birth:    1964

Previous Name/s (aka):             Social Security Number:    8353

**I Authorize:**

| St. Joseph Regional Medical Center<br>415 Sixth Street<br>P.O. Box 816<br>Lewiston, ID 83501 | NW Med Star Critical Care Transport<br>P.O. Box 11005<br>Spokane Valley, WA 99211-1005 |
|---|---|

To release health care
information to the following organization for the purpose of collecting and reviewing records:

> FREY BUCK, P.S.
> 1200 Fifth Avenue, Suite 1900
> Seattle, WA 98101
> (206) 486-8000

**Information to be Released:**                **Dates of Treatment:**

[X] All Medical Records             [X] All Dates

[X] All Medical Bills                [ ] Specific Dates:

[X] X-Ray, imaging reports, Laboratory reports

1. I understand that my express consent is required to release any health care information relating to testing/diagnosis, and/or treatment for HIV (AIDS Virus), sexually transmitted diseases, psychiatric disorders/mental health, or drug and/or alcohol use. If I have been tested, diagnosed, or treated for HIV (AIDS Virus), sexually transmitted diseases, psychiatric disorders/mental health, or drug and/or alcohol use, you are specifically authorized to release all health care information relating to such diagnosis, testing or treatment.

2. I understand that authorizing the disclosure of this health information is voluntary and you have my consent to release medical records for all dates including all diagnostic tests of any type and reports, history, hospitalization, diagnosis, prognosis, treatment, medication and pharmacy records, correspondence, consults, statement of charges or expenses. Any and all reports of any type or character.

3. I understand I have the right to revoke this authorization in writing. I understand the revocation will not apply to information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. To revoke an authorization I may fill out a revocation form available at the facility/Provider or write a letter to the facility/Provider.

4. I understand I do not have to sign this authorization in order to obtain health care benefits (treatment, payment, or enrollment).

*Stacie Lee Phelan Kane*                   2/11/2015
Stacie Lee Phelan Kane, Personal Representative      Date
for The Estate of Joseph Russell Kane

This consent will expire 3 years from the date of signing or at the conclusion of the instant lawsuit, whichever occurs first.

{00133046;1}

**FILED**

14 AUG 11 AM 9:00

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 14-4-04370-5 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

IN THE MATTER OF THE ESTATE )
OF                           )        NO. 14-4-04370-5SEA
                             )
JOSEPH R. KANE,              )        NOTICE OF APPOINTMENT
                             )        AND PENDENCY OF
          Deceased.          )        PROBATE

YOU ARE HEREBY NOTIFIED that on the ___30th___ day of

___July___, 2014, the undersigned individual was

appointed and has qualified as administrator of the above-entitled

estate and that probate proceedings are pending.

_Stacie L Kane_
Stacie L. Kane

SUBSCRIBED AND SWORN TO before me this ___30th___ day

of ___July___, 2014.

_Theresa L Gallagher_
Printed Name: ___Theresa L. Gallagher___
Notary Public in and for the State
of Washington, Residing at ___Bonney Lake___
My Commission Expires: ___04/20/17___

LAW OFFICES OF
DOMINICK V. DRIANO, PLLC
WEST SEATTLE PROFESSIONAL BUILDING
4511 - 44TH AVENUE S.W.
SEATTLE, WA 98116
(206) 935-5805

NOTICE OF APPOINTMENT
AND PENDENCY OF PROBATE

STJOSEPH 00005

```
J5138957     KANE,JOSEPH
```

```
ACCT: J5138957                    GUAR: 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
KANE,JOSEPH                       KANE,STACIE
28811 GRESHAM PLACE NE            28811 GRESHAM PLACE NE
POULSBO, WA 98370                 POULSBO, WA 98370
(360)598-1765 (H)                   (360)598-1765 (H)


50 M         ADM/SER:   06/27/14   UR CHG:       0 MSB          0
ER           DISCHARGE: 06/27/14   AR CHG:  1105.50 SELF        0
FB 07/02/14  LST STMT:  08/05/14   BALANCE:      0
```

| BCH DATE | BCH | SER DATE | TIME | USER | PROCEDURE | BL# | DESCRIPTION | AMOUNT | TOTAL |
|----------|-----|----------|------|------|-----------|-----|-------------|--------|-------|
| 07/02/14 | 69 | 06/27/14 | | RN.PLS | 0605030 | | LEVEL 3 EMERGENCY DEPT VISIT | 759.00 | 759.00 |
| 06/28/14 | 6 | 06/27/14 | | MM.LAV | 8031502 | | SALINE 0.9% NS 1000ml EACH | 13.70 | 772.70 |
| 06/28/14 | 6 | 06/27/14 | | MM.LAV | 8039026 | | INJECT SITE MALE ADAPTER | 12.60 | 785.30 |
| 06/28/14 | 6 | 06/27/14 | | MM.LAV | 8039026 | | INJECT SITE MALE ADAPTER | 12.60 | 797.90 |
| 06/28/14 | 6 | 06/27/14 | | MM.LAV | 8040313 | | PRIMARY GRAVITY SET | 42.40 | 840.30 |
| 06/28/14 | 6 | 06/27/14 | | MM.LAV | 8914020 | | BAIR HUGGER FULL BODY BLANKET | 27.30 | 867.60 |
| 06/28/14 | 6 | 06/27/14 | | MM.LAV | 8918054 | | CATHETER FOLEY 16FR SENSOR TIP | 45.20 | 912.80 |
| 06/28/14 | 6 | 06/27/14 | | MM.LAV | 8989220 | | TRAY, FOLEY CATH W/METER | 71.40 | 984.20 |
| 06/28/14 | 6 | 06/27/14 | | MM.LAV | 8989782 | | TUBE CONNECTING | 5.30 | 989.50 |
| 06/27/14 | 213 | 06/27/14 | 1533 | AUTOCLOSE | 0550145 | | 99283 EXPNDED EXAM, LOW TO MOD ($116.00 P/C) | 116.00 | 1105.50 |
| 06/27/14 | 213 | 06/27/14 | 1553 | AUTOCLOSE | 0600000 | | CHARGES COMPLETED | 0.00 | 1105.50 |
| 07/02/14 | 240 | 06/27/14 | 1553 | AUTOCLOSE | 0600000 | | CHARGES COMPLETED (-1X) | 0.00 | 1105.50 |
| 07/02/14 | 240 | 06/27/14 | 1553 | AUTOCLOSE | 0600000 | | CHARGES COMPLETED | 0.00 | 1105.50 |
| 07/03/14 | 85 | 07/02/14 | | DP.IATMNC | ACHARUI | 1 | UNINSURED ADJUSTMENT - FINAL - BILL #  1 | -66.33 | 1039.17 |
| 08/11/14 | 64 | 08/11/14 | | PA.LXR | ACHARUI | 1 | UNINSURED ADJUSTMENT (-1X) - FINAL - BILL #  1 | 66.33 | 1105.50 |
| 08/21/14 | 106 | 08/20/14 | | PA.JXH | AMSBCA | 1 | RBS CONTRACTUAL ALLOWANCE - REGENCE.5010.UB ADJ Adj to UCRN: JCE16118 | -480.09 | 625.41 |
| 08/21/14 | 113 | 08/20/14 | | PA.JXH | AMSBCA | 1 | RBS CONTRACTUAL ALLOWANCE - REGENCE.5010.UB ADJ Adj to UCRN: JCE16270 | -27.63 | 597.78 |
| 08/21/14 | 106 | 08/20/14 | | PA.JXH | PMSB | 1 | REGENCE BLUE SHIELD OF IDAHO - REGENCE.5010.UB RCP Pmt to UCRN: JCE16118 | -491.37 | 106.41 |
| 08/21/14 | 113 | 08/20/14 | | PA.JXH | PMSB | 1 | REGENCE BLUE SHIELD OF IDAHO - | -88.37 | 18.04 |

STJOSEPH 00006

| | | | | | REGENCE.5010.UB RCP<br>Pmt to UCRN: JCE16270 | | |
|---|---|---|---|---|---|---|---|
| 08/26/14 127 08/26/14 | PA.JXH | ASBWO | 1 | SMALL BALANCE WRITE OFF | -18.04 | 0 |

STJOSEPH 00007

St. Joseph Regional Medical Center    P.O. BOX 816 • LEWISTON,IDAHO 83501 (208) 743-2511

| PATIENT NAME/ADDRESS | | ACCOUNT NO. | ROOM/BED | TYPE | LOCATION/SERVICE | MEDICAL RECORD NO. |
|---|---|---|---|---|---|---|
| | | | | | | |

DATE OF BIRTH | AGE | SEX | M.S. | RELIGION | RACE | ARRIVAL MODE

PHONE
SOC.SEC.NO.
EMPLOYER
GUARANTOR NAME/ADDRESS

PERSON TO NOTIFY/ADDRESS                RELATIONSHIP

HOME PHONE                WORK PHONE
NEXT OF KIN/ADDRESS                RELATIONSHIP

PHONE
RELATIONSHIP
EMPLOYER
FINANCIAL CLASS                HOME PHONE                WORK PHONE

| INSURANCE NAME | POLICY NUMBER | COVERAGE NUMBER | SUBSCRIBER INSURED NAME |
|---|---|---|---|
| | | | |

| ACCIDENT INFORMATION | REASON FOR VISIT | MAIDEN/OTHER NAME |
|---|---|---|
| ACCIDENT DATE/TIME | COMMENTS | ADVANCED DIRECTIVES |

| ADMISSION DATE/TIME | ADMITTING PHYSICIAN | ATTENDING PHYSICIAN | REGISTRAR |
|---|---|---|---|
| DISCHARGE DATE/TIME | DISCHARGED TO: | HOSPITAL DAYS | SERVICE |

PATIENT EMAIL ADDRESS

PRINCIPAL DIAGNOSIS (CONDITION AFTER STUDY RESPONSIBLE FOR ADMISSION)

SECONDARY DIAGNOSIS

OPERATIONS/PROCEDURES

CONSULTANTS

CONDITION ON    RECOVERED    IMPROVED    NOT IMPROVED    DIED: UNDER 48 Hrs. ___
DISCHARGE:                OVER 48 Hrs.

I certify that the narrative descriptions of the principal
and secondary diagnosis and the major procedures performed
are accurate and complete to the best of my knowledge.

SIGNATURE OF ATTENDING PHYSICIAN        DATE

FORM ID: FS (Face Sheet)        ANESTHESIA    PHYSICIAN    CHART        Inpt/Opt Admission Record

# ROUTINE  DONOR  INQUIRY

Patient's Name: _John Doe_

DATE/TIME OF EXPIRATION: _6_ / _27_ / _14_    _2_ _25_ am/~~pm~~

Attending Physician: _Hunter_

**THE CORONER:**     [ ] Does NOT need to be notified of this death.

[ ] Has been notified and has no objections to donation.

[X] Has been notified and  objects to donation.

Time and date notified: ___ ___ am / ___ / ___
pm

Name of Lewiston coroner: _Gary Gillam_

Name of coroner from outside Lewiston: _____

County: _____

**NEXT  OF  KIN  NOTIFIED**     [ ] Signed consent for donation.

[ ] Declined donation.

**REASONS FOR NOT  OBTAINING DONATION:**

[ ] Medical criteria indicate the deceased would not yield  usable organs or tissues.

[ ] Inability to obtain consent in a timely manner.

[ ] Coroner or next of kin objected to donation (see above).

[ ] OTHER: (explain) _____

_____

_____                       _____
Signature of Staff                       Date/Time

**Pre - screening / Comments:** _____

_____

_____                       _____
Signature of Staff                       Date/Time

_Joseph Kane_

## ST. JOSEPH REGIONAL MEDICAL CENTER
Lewiston, Idaho

## ROUTINE DONOR INQUIRY

0000898    4/01/02    LJN  pcs

[AC]    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
DOE,JOHN
M                               50
06/27/14                  J207051
                          J5138957

STJOSEPH 00009

```
RUN DATE: 06/23/14                      Order Entry  **LIVE**                           PAGE 1
RUN TIME: 0085                          Discharge Report
RUN USER: MD.JAH

PATIENT:  KANE,JOSEPH                   A/S: 50 M        ADMIT:    06/27/14
ACCOUNT NO: 35178957                    LOC: ER          DISCH/DEP: 06/27/14
                                        RM:              STATUS:   DEP ER
ATTEND DR: HUNTER,JAY                   BD:              UNIT NO:  J2C7051
```

| Category | Procedure | Order Number | Date | Time | Pri | Qty | Ord Source | Status | Ordered By |
|----------|-----------|--------------|------|------|-----|-----|------------|--------|------------|
| ERDEY | EDCEC | 20140627-0055 | 06/27/14 | 1432 | S | | PCM | TRK | HUNTER |

Other Provider :                Sig Lvl Provider :

Order's Audit Trail of Events
```
1   06/27/14 1432 MD.JAH      Order ENTER in EDM/POM
2   06/27/14 1432 MD.JAH      Order from set: Provider Dictation/Charges
3   06/27/14 1432 MD.JAH      Ordering Doctor: HUNTER,JAY
4   06/27/14 1432 MD.JAH      Order Source: SIGNED
5   06/27/14 1432 MD.JAH      Signed by HUNTER,JAY
```

| Category | Procedure | Order Number | Date | Time | Pri | Qty | Ord Source | Status | Ordered By |
|----------|-----------|--------------|------|------|-----|-----|------------|--------|------------|
| ERDEY | MD | 20140627-0055 | 06/27/14 | 1432 | S | | PCM | TRK | HUNTER |

Other Provider :                Sig Lvl Provider :

Order's Audit Trail of Events
```
1   06/27/14 1432 MD.JAH      Order ENTER in EDM/POM
2   06/27/14 1432 MD.JAH      Order from set: Provider Dictation/Charges
3   06/27/14 1432 MD.JAH      Ordering Doctor: HUNTER,JAY
4   06/27/14 1432 MD.JAH      Order Source: SIGNED
5   06/27/14 1432 MD.JAH      Signed by HUNTER,JAY
```

| Category | Procedure | Order Number | Date | Time | Pri | Qty | Ord Source | Status | Ordered By |
|----------|-----------|--------------|------|------|-----|-----|------------|--------|------------|
| NCPEY | NCCEG | 20140627-0067 | 06/27/14 | 1432 | S | | PCM | TRK | HUNTER |

Other Provider :                Sig Lvl Provider :

Order's Audit Trail of Events
```
1   06/27/14 1432 MD.JAH      Order ENTER in EDM/POM
2   06/27/14 1432 MD.JAH      Order from set: Provider Dictation/Charges
3   06/27/14 1432 MD.JAH      Ordering Doctor: HUNTER,JAY
4   06/27/14 1432 MD.JAH      Order Source: SIGNED
5   06/27/14 1432 MD.JAH      Signed by HUNTER,JAY
```

| Category | Procedure | Order Number | Date | Time | Pri | Qty | Ord Source | Status | Ordered By |
|----------|-----------|--------------|------|------|-----|-----|------------|--------|------------|
| NCPEY | MD1 | 26140627-0065 | 06/27/14 | 1432 | S | | PCM | TRK | HUNTER |

Other Provider :                Sig Lvl Provider :

Order's Audit Trail of Events
```
1   06/27/14 1432 MD.JAH      Order ENTER in EDM/POM
2   06/27/14 1432 MD.JAH      Order from set: Provider Dictation/Charges
3   06/27/14 1432 MD.JAH      Ordering Doctor: HUNTER,JAY
4   06/27/14 1432 MD.JAH      Order Source: SIGNED
5   06/27/14 1432 MD.JAH      Signed by HUNTER,JAY
```

PERMANENT MEDICAL RECORD COPY

STJOSEPH 00010

HISTORY OF PRESENT ILLNESS:
The patient is a 50 year-old who two and a half hours prior to arrival here was submerged in rafting accident for ten minutes. He was pulled out without pulse respiration. CPR was started. He was transported by boat to the nearest EMT which was in hour transport. Eventually helicopter was called. When they reached the EMT they had an automated defibrillator, but it read as not indicating defibrillation. When the paramedics arrived on the helicopter he was in asystole. They intubated him with a surgeon esophageal temperature probe. Gave the routine cardiac drugs including Epinephrine and continued  CPR throughout the flight. The patient remained in asystole with no spontaneous respirations or pulse. When he arrives here his esophageal temperature is 90. Patient had fixed, dilated pupils. He is mottled, cold. Ultrasound shows complete absence of any cardiac activity.

ASSESSMENT:
Patient is not deeply enough hypothermic to be cause for the arrest. At his core temperature of 90, he has been asystolic for two and a half hours at this point, so further resuscitation was not attempted.

MR.ISB
D: 06/27/2014 14:32:36
T: 07/01/2014 09:27:50
375206

<Electronically Signed>
JAY HUNTER
07/07/14 0825

--------------------------------------------------------------------
EMERGENCY DEPT/MINOR CARE REPORT Patient Name:    KANE.JOSEPH
                                 Patient DOB:       ./64
                                 Acct/Unit Number:J5138957     J207051
    ST JOSEPH REGIONAL           Physician:       HUNTER.JAY
      MEDICAL CENTER             Visit Date:      06/27/14
      Lewiston, Idaho            Location/Room #  ER
                                 Discharge Date:  06/27/14


Copy                                               Page 1 of 1

STJOSEPH 00011

```
RUN DATE: 03/02/15          St. Joseph's Emergency Department Mgmt          PAGE 1
RUN TIME: 1124                       ED SUMMARY RPT
RUN USER: MR.BSC
```

**Patient:** KANE,JOSEPH                    **Age/Sex:** 50/M                  **Acct No:** J5138957
**ED Provider:** HUNTER,JAY, ACT                                             **Unit No:** J207051

## ASSESSMENTS

*06/27/14  1433   Triage Assessment*                              *CHIPMAN,DOROTHY, RN*
  **DOB:**
  02/14/64
  **Onset of Symptoms+** Known
  **Date of Onset:** 06/27/14
  **Time of Onset:** 1200
  **Stated Complaint:**
  HERE VIA MEDSTAR DUE TO DROWNING, FELL OFF BOAT WHILE
  FISHING WAS UNDER WATER FOR 10 MINUTES, APPROXIMATELY
  2-2.5 HOURS SINCE FALL OUT OF BOAT, FULL CARDIAC ARREST
  WAS ASYSTOLE THE WHOLE TIME 2 EPI, INTUBATED WITH
  RIGHT NASAL TRUMPET, ALSO HAVE NGT ON LEFT NARE,
  BRIGHT RED BLOOD COMING OUT OF RIGHT NOSE, CYANOTIC AND
  COLD TO TOUCH, PULSELESS, PUPILS DILATED, FIXED AND
  NON REACTIVE. DR. HUNTER IN THE ROOM ON ARRIVAL
  AFTER HE'S ASSESSMENT AND DURATION OF TIME THIS PATIENT
  BEEN ON CARDIAC ARREST HE DECIDED MEDICAL INTERVENTION IS
  FULTILE. NO IDENTIFICATION GATHERED FROM THIS PATIENT
  AT THIS TIME. SUPERVISOR WILL NOTIFY CORONER
  POLICE OFFICER ALSO HERE FOLLOWING UP.
  **-^Triage Acuity:** Resusitation
  **Ht (ft):** 0
  **in:** 0
  **cm:** 0.00
  **Wt(lbs):** 350.0
  **oz:** 0
  **kg:** 158.750
  **BMI:** .0
  **Height Source:** Estimated
  **Scale+** Estimated Weight
  **Smoking Status+** Unknown if Ever Smoked

## GENERAL

**ED Physician:** HUNTER,JAY, ACT              **Arrival Date/Time:** 06/27/14 - 1416
**Practitioner:**                              **Triage Date/Time:** 06/27/14 - 1433
**Nurse:** CHIPMAN,DOROTHY, RN                 **Date of Birth:**        /1964

**Stated Complaint:** DROWNING
**Chief Complaint:** Drowning                  **Priority:** 1
**Status Event History:**
      06/27/14  1417 In Room
                1432 Pending Discharge
                1432 With ED Provider
                1433 Pending Discharge
                1554 Patient Left Dept

## DEMOGRAPHICS

28811 GRESHAM PLACE NE
POULSBO, WA 98370
(360)598-1765
**Insurance:** REGENCE BLUE SHIELD ID          **PCP:**

Patient: KANE,JOSEPH

STJOSEPH 00012

```
RUN DATE: 03/02/15        St. Joseph's Emergency Department Mgmt              PAGE 2
RUN TIME: 1124                         ED SUMMARY RPT
RUN USER: MR.BSC
```

| | |
|---|---|
| **Patient:** KANE,JOSEPH | **Age/Sex:** 50/M      **Acct No:** J5138957 |
| **ED Provider:** HUNTER,JAY, ACT | **Unit No:** J207051 |

```
Next of Kin:                          Family Doctor:
 Relation:                             Referring:
 Phone:
```

### PREFERRED PPHARMACY

No Preferred Pharmacy Entered

### ORDERS

| Ordered | Order | Ordering Provider | E-Signed |
|---|---|---|---|
| 06/27/14 1432 | ED Provider Charges | HUNTER,JAY | Yes |
| 06/27/14 1432 | MD Dictation | HUNTER,JAY | Yes |
| 06/27/14 1432 | MC Provider Charges | HUNTER,JAY | Yes |
| 06/27/14 1432 | PA Dictation | HUNTER,JAY | Yes |

### DEPARTURE

```
Disposition: EXPIRED                  Departure Date/Time: 06/27/14 - 1553
Comment:
Condition:

Referrals:

Pt Instructions:

Additional Instructions:

Departure Forms: Portal Information
```

### NOTES

*Entered by CHIPMAN,DOROTHY, RN on 06/27/14 at 1442*
IN ADDITION TO MY TRIAGE NOTES PLEASE NOTE THAT BAIR HUGGER, FOLEY TRAY ARE
ALL SET UP WITH WARMED IV FLUID PRIMED. ALSO EASY IO ON LEFT LOWER LEG
ALREADY IN STARTED BY EMS. ALSO ABDOMEN OF PATIENT LOOKS BLOATED AND DISTENDED.

*Entered by CHIPMAN,DOROTHY, RN on 06/27/14 at 1455*
CORONER HERE TO SEE PATIENT.

*Entered by CHIPMAN,DOROTHY, RN on 06/27/14 at 1517*
CORONER WILL CALL ON CALL FUNERAL WHICH IS VASSAR RAWLS, NAME GATHERED FOR THIS
PATIENT IS JOSEPH NO LAST NAME AT THIS TIME. SON IS COMING BUT IT MIGT BE A
WHILE.

*Entered by CHIPMAN,DOROTHY, RN on 06/27/14 at 1538*
PATIENT TAKEN BY FUNERAL HOME VASSAR RAWLS.

**Patient:** KANE,JOSEPH

STJOSEPH 00013

Jun. 28. 2014 10:57AM                                                    No. 1202   P. 1



[AC]
KANE,JOSEPH                                    50
M                    I/64                   J207051
06/27/14                                    J5138957

## Based in Spokane and Richland, Washington

Business: 509-536-5462 or 1-800-572-3210
Dispatch: 509-532-7990 or 1-800-422-2440
Membership: 1-866-478-0556

# *Fax Transmittal Form*

**To:** St. Joseph's                    **Date:** 6/28

**Fax #:**                              **Number of Pages:**
                                        (including cover page)
208 799-5766                            8

## Message:

## MEDSTAR TRANSPORT
## PLEASE PLACE IN PATIENT'S CHART

Thank You, Bru

# CONFIDENTIAL

The information contained in this facsimile is privileged and confidential. It is intended for the use of the person/organization listed above. If you have received this copy in error, please call us immediately to arrange for return of the document. If you are neither the intended recipient nor the employee/agent responsible for delivering this information to the intended recipient, you are notified that disclosing, copying, or redistributing this information is strictly prohibited.

Northwest MedStar   6315 E Rutter Way   Spokane WA 99212

G:\Fax Cover Sheet\fax form medical.pub

STJOSEPH 00014

Jun. 28. 2014 10:58AM                                                No. 1292   P. 2



**TRANSPORT NOTES**
**Northwest MedStar**
SPOKANE, WA 992121445
Telephone: 1-800-572-3210

## PATIENT INFORMATION

| | | |
|---|---|---|
| Name: KANE, JOSEPH | Run Number: 4724 | Race: Caucasian |
| DOB/Age: /1964 (50 yrs) | Sex: Male | Personal Effects: None |
| Height (inches): | Weight: 125.00 kgs | |

## TRANSFER INFORMATION

Nature of Call: On Scene
Mode: Palouse - Helicopter
Vehicle: MS10
Location: 46°05.150'N, 116°59.007'W
ASOTIN, WA 99402

Department:

Referring MD:

Receiving Agency: Saint Josephs Regional Med Ctr
BOX 816
415 6TH ST
LEWISTON, ID 83501

Department: ER

Receiving MD: Hunter, Jay

Time of Injury: 06/27/14 12:00
Call Assigned: 06/27/14 13:19
Lift/Depart: 06/27/14 13:24
Land: 06/27/14 13:49
Arrive Hospital/Scene: 06/27/14 13:49
Arrive Bedside: 06/27/14 13:50
Depart Bedside: 06/27/14 13:55
Depart Hospital/Scene: 06/27/14 13:56
Lift With Patient: 06/27/14 14:00
Land With Patient: 06/27/14 14:12
Arrive Receiving Hospital: 06/27/14 14:15
Care Transferred: 06/27/14 14:21

## IMPRESSIONS

Primary Impression: Cardiac Arrest
Secondary Impressions: Drowning And Nonfatal Submersion
Vent Dependent

## HISTORY

Allergies:
Unknown
Cause of Injury:
Drowning (E910.0)
Chief Complaint:
Altered Consciousness - Unresponsive          Respiratory Arrest
Medications:
Unknown –
Past Medical History:
Unknown

[AC]                     KANE, JOSEPH                         50
                         M          /64          J207051
                         06/27/14                 J5138957

## NARRATIVE

MedStar scene response requested for a 50 year old male near Heller Bar, WA. Patient is a 50 year old male that fell out of a boat and was submerged for 10 mins prior to being pulled out of river and transported to shore and EMS called. MedStar response requested per ALS paramedics on scene. Boat landing where patient was brought is extended distance from closest hospital, > 1 hour ground transport time. Due to this remote location air transport requested. Patient is a hypothermic drowning victim in cardiopulmonary arrest and requires immediate transport to nearest hospital. Air transport approximately 12 mins. St. Joseph's Medical Center in Lewiston, ID is closest hospital.

Per law enforcement report after speaking with witnesses not initially available on scene. Patient was rafting with guided raft company wearing life jacket and helmet and fell out of the raft in a set of rapids called the slide. This is a significant set of rapids. Patient went through the rapids and was submerged at times during this and then was pulled into a private boat and brought to nearest landing that was approximately 1 hour by boat. Patient did receive CPR during this time. EMS then dispatched.

## PRIOR TO ARRIVAL

| | | | |
|---|---|---|---|
| JOSEPH KANE | DOB: 64 (50 yrs) | Run #: 4724 | Page 1 of 7 |

STJOSEPH 00015

Jun. 28. 2014 10:58AM                                                No. 202  P. 3



| | |
|---|---|
| **MEDSTAR** | **TRANSPORT NOTES** |
| NORTHWEST | **Northwest MedStar** |
| CRITICAL CARE TRANSPORT SERVICE | SPOKANE, WA 992121445 |
| | Telephone: 1-800-572-3210 |

| PTA Narrative | EMT-P | Per report patient was initially treated by BLS EMS that arrived with AED that said no shock advised. Then ALS arrived and intubated, I/O placed and 2 rounds of EPI given. Only Asystole seen on monitor. Down time prior to contact with any EMS 75-90 mins |
|---|---|---|

### ASSESSMENTS

**2014-06-27   13:52:00   By: ROGGE, BRIAN**   Patient lying on Ambulance stretcher in full C-spine with chest compressions and manual ventilations.

| Body Area | Assessment |
|---|---|
| Airway | Artificial Airway - Oral ETT |
| | 8.0 ETT 22 at the teeth |
| Circulation | Femoral - Absent |
| | Cap Refill Time - Delayed |
| Breathing | Manual Ventilations |
| External/Skin | Skin Color - Pale |
| | Skin Color - Cyanotic |
| | Skin Color - Mottled |
| | Skin Moisture - Dry |
| | Skin Temperature - Cool |
| Neuro | General - Unresponsive |
| | Motor - Unresponsive |
| | Speech - Intubated |
| Head | Assessed with No Abnormalities |
| Right Eye | Other |
| | Non-reactive 4mm |
| Left Eye | Other |
| | Non-reactive 4mm |
| Nose/Mouth | Other |
| | Blood coming from nasal pharyngeal airway in right nares |
| Face | Other |
| | Cyanotic |
| Nose/Mouth Interventions | ETT |
| | Trumpet Tube - Right Nare |
| Neck | Assessed with No Abnormalities |
| | Patient in full C-spine |
| Chest | Crepitus |
| | Reddened bruised area center of chest, presumedly from CPR |
| Chest - Lung Sounds | Left - crackles |
| | Very mild |
| | Right - crackles |
| | Very mild |
| Heart Tones | Inaudible |
| | Asystole on monitor |
| Abdomen | Distention |
| Pelvis | Assessed with No Abnormalities |
| Right Arm | Assessed with No Abnormalities |
| Left Arm | Assessed with No Abnormalities |
| Right Leg | Assessed with No Abnormalities |
| Left Leg | Other |
| | Patent EZ I/O left tibia |
| Skin | Other |
| | Patient is cyanotic and bluish color from shoulders up. |

[AC]   KANE,JOSEPH
M                64                    50
06/27/14                          J207051
                                   J5138957

| JOSEPH KANE | DOB:   ·/64 (50 yrs) | Run #: 4724 | Page 2 of 7 |
|---|---|---|---|

STJOSEPH 00016

Jun. 28. 2014 10:58AM                                        No. '202   P. 4

# MEDSTAR
### NORTHWEST
CRITICAL CARE TRANSPORT SERVICE

TRANSPORT NOTES
**Northwest MedStar**
SPOKANE, WA 99212-1445
Telephone: 1-800-572-3210

[AC]

50
KANE,JOSEPH
M              /64              J207051
06/27/14                        J5138957

JOSEPH KANE          DOB:    964 (50 yrs)        Run #: 4724        Page 3 of 7

STJOSEPH 00017

Jun. 28. 2014 10:58AM                                                    No. 1202   P. 5



[AC] ‖‖‖‖‖‖‖‖‖‖‖‖          TRANSPORT NOTES
KANE,JOSEPH                              50        Northwest MedStar
M              /64        J207051         SPOKANE, WA 992121445
06/27/14                   J5138957       Telephone: 1-800-572-3210

| Time | Event | | |
|---|---|---|---|
| 13:24 | Lift/Depart | | |
| 13:49 | Land/Arrive | | |
| 13:50 | Arrive Bedside | | |
| 13:51 | Report | EMT-P | Paramedic States due to hypothermic condition of patient that he requires transport. |
| | From=EMT-P | Name=Willie | To=Medstar Transport Team |
| | Name=Brian / Cade | Report Via=Bedside Report | |
| 13:51 | ETT Check | MOWRY, CADE | |
| | ETT Check=Initial | Ventilation Method=BV-ETT | ETT size=8.0 |
| | ETT Depth=22cm | ETT measured at=Teeth | ETT Secured With=Thomas Tube Holder |
| | ETT Cuff Pressure=MOV | ETT Verification #1=Bilateral Breath Sounds | ETT Verification #2=Symmetrical chest rise |
| | ETT Verification #3=Absent over the epigastrium | ETT Verification #4=Stable SpO2 | ETT Verification #5=Fogging in tube |
| 13:53 | Warming Measures | ROGGE, BRIAN | Placed heating blanket between Dr Down and top sheet Warm IV fluids placed in both axilla per EMS prior to transfer to helicopter |
| | Warm Blanket=Yes | Commercial Heating Blanket=No direct skin contact | Removed Wet Clothing=Yes |
| | Radiant Warmer=No | | |
| 13:53 | IV Site Check | ROGGE, BRIAN | EZ I/O left tibia, working well. |
| | Site label=Site #1 | Location=Left Tibia | Size=15 G |
| | Use=IV Fluids | Site Condition=Asymptomatic | |
| 13:54 | Oxygen | MOWRY, CADE | |
| | LPM=15 | Route=BVETT | Continuation of treatment=Yes |
| | Authorizing By=MedStar Protocol | | |
| 13:54 | IV Fluid | ROGGE, BRIAN | Wide open on pressure bag. Appears to be running approximately 500ml/hr |
| | Solution=0.9% NS | Volume=1000 mL | Rate (mL/hr)=Wide Open |
| | IV Site=Site #1 | Site condition=Asymptomatic | |
| 13:55 | Depart Bedside | | Requested law enforcement on scene to contact St. Joseph's in Lewiston of inbound full arrest patient due to lack of communication options from flight crew. |
| 13:55 | CPR-Start | ROGGE, BRIAN | Continuation of CPR from Lewiston fire crew. |
| | Cardiac Rhythm=Asystole (noted in 2 leads) | Pt. Position=on backboard | Oxygenation via=BVETT |
| | Pulse with CPR=absent | Authorizing Physician=MedStar Protocol | |
| 13:56 | Pt. Packaging | | moved to=Helicopter stretcher covered with=Dr. Down Rescue Wrap |
| | Monitored by=Zoll Propaq X-Series with=Full C-spine immobilization and secured by=3 straps with shoulder restraints | Pt. moved=With backboard position=Supine Lines and Tubes=Secure and in proper position | |
| 13:58 | Pt. Loaded | | |
| | Vehicle=Helicopter | Lines and Tubes=Secure and in proper position | |
| 13:58 | Monitor | ROGGE, BRIAN | |
| | Monitor Type=Zoll X-Series Capnography=in-line Capnography | BP by=NIBP Successful=Yes | SPO2=Disposable Probe Authorizing Physician=MedStar Protocol |
| 14:00 | Lift/Depart With Patient | | |

JOSEPH KANE              DOB:   1964 (50 yrs)        Run #: 4724              Page 4 of 7

STJOSEPH 00018

Jun. 26. 2014 10:58AM                                                      No. 1202   P. 6

**MEDSTAR**
NORTHWEST
CRITICAL CARE TRANSPORT SERVICE

[AC]     KANE, JOSEPH              50     TRANSPORT NOTES
         M            '64      J207051   Northwest MedStar
         06/27/14            J5138957   SPOKANE, WA 992121445
                                         Legphone: 1-800-572-3210

| 14:02 | Ventilator Set Up (Invasive) | MOWRY, CADE | |
|---|---|---|---|
| Settings=Initial | Pt. found on=BVETT | Pt started on=ReVel |
| Breath Mode=A/C | Breath Type=Volume | Set RR=12 |
| Total RR=12 | Set Vt=550 | Exhaled Vt=524 |
| FiO2=100 | PIP=24 | PEEP/CPAP=8 |
| I-Time=1.0 | I:E Ratio=1:2.1 | Minute volume=6.8 |
| MAP (cmH2O)=12 | High PIP alarm (cmH20)=40 | Low PIP alarm (cmH20)=10 |
| Authorized by=MedStar Protocol | Complications=No | Successful=Yes |
| Number of Attempts=1 | | |

| 14:03 | Temperature | ROGGE, BRIAN | |
|---|---|---|---|
| Site=Esophageal | Temp °F=89.6 | |

| 14:05 | Temperature | RN | Confirmed with hypothermic thermometer. |
|---|---|---|---|
| Site=Axillary | Temp °F=87.6 | |

| 14:07 | Manual Ventilation | MOWRY, CADE | Unable to get ETCO2 reading on monitor while pt on vent. Vent not alarming and is working, decision made to use BVM to ventilate in order to monitor ETCO2 for indication of ROSC. |
|---|---|---|---|
| Type=Self Inflating Bag | Via=ETT | O2 source=100% O2 |
| Bag Size=Adult | Mask Size=Adult | Chest Rise=Equal |
| PEEP=no | Resp Rate (BPM)=12 | EtCO2 (mmHg)=10 |
| Authorized by=MedStar Protocol | Complications=No | Successful=Yes |

| 14:09 | Cabin/Iso Temp | MOWRY, CADE | |
|---|---|---|---|
| Cabin or Isolette temperature=82.4 | | |

| 14:10 | Gastric Tube Insertion | ROGGE, BRIAN | For consideration of abdominal distention contributing to current patient condition. |
|---|---|---|---|
| Size=16 Fr | Type=Salem | Route=Left Nares |
| Verification=Gastric Contents Returned | Contents=Bloody Drainage | Indication=Abdominal Distention |
| Suction=Open to Air | Number of Attempts=1 | Successful=Yes |
| Complications=No | Authorized by=MedStar Protocol | |

| 14:10 | Report | ROGGE, BRIAN | Unable to reach SJRMC prior to this. Alerted them of imminent arrival of full arrest drowning victim. |
|---|---|---|---|
| From=Medstar Transport Team | Name=Brian | To=ED Staff |
| Report Via=Radio Patch | | |

| 14:12 | Land With Patient | | |
|---|---|---|---|

| 14:13 | ETT Check | MOWRY, CADE | Used glidescope for ETT visualization secondary to audible leak heard from nasal pharyngeal airway. ETT visualized between cords. |
|---|---|---|---|
| ETT Check=Final | Ventilation Method=BV-ETT | ETT size=8.0 |
| ETT Depth=22cm | ETT measured at=Teeth | ETT Secured With=Thomas Tube Holder |
| ETT Cuff Pressure=MOV | ETT Verification #1=Tube visualized between cords | ETT Verification #2=Bilateral Breath Sounds |
| ETT Verification #3=Symmetrical chest rise | ETT Verification #4=Positive capnography | ETT Verification #5=Fogging in tube |

| 14:14 | Pt. Unloaded | | |
|---|---|---|---|
| From=Helicopter | Lines/Tubes=Secure and in proper position | |

| 14:19 | Transport Summary | ROGGE, BRIAN | Patient had no change during flight. Patient continued in asystole. CPR in progress during flight. Due to hypothermic nature, no additional ACLS medications were given. |
|---|---|---|---|
| Pt Transferred to=ED Stretcher | Report given to=ED Staff | Name=Dorothy RN, Dr. Hunter |
| IV fluids=Double clamped prior to transfer | All lines and tubes=Secure in proper position | Personal Belongings=No personal belongings |
| Maximum Cabin Altitude (MSL)=3000 | | |

JOSEPH KANE                    DOb     .964 (50 yrs)           Run #: 4724              Page 5 of 7

STJOSEPH 00019

Jun. 28. 2014 10:58AM                                              No. 1292   P. 7



# NORTHWEST MEDSTAR
## CRITICAL CARE TRANSPORT SERVICE

**TRANSPORT NOTES**
**Northwest MedStar**
SPOKANE, WA 992121445
Telephone: 1-800-572-3210

| 14:20 | CPR-Stop | MOWRY, CADE | Dr. Hunter ceased resuscitative efforts at this time. |
|---|---|---|---|
| Reason=Temporary for pt. transfer | | Total Resuscitation Time=15 minutes | Authorized by=MedStar Protocol |
| 14:20 | Intake/Output | ROGGE, BRIAN | |
| Intake-Pre-hospital=500 | | Intake-Transport-Fluids=100 | |

### VITAL SIGNS

| Time | PTA | BP | Pulse | Monitor Rate | Respiratory | SPO1 | EtCO1 | Glucose | GCE |
|---|---|---|---|---|---|---|---|---|---|
| 06/27/2014 13:52 | | 0 | 0 | | 16 BVETT | | | | |
| Pupil Reacts: Left=Non-Reactive, Right=Non-Reactive | | | | | | | | | |
| Cardiac Rhythm=Asystole | | | | | | | | | |
| Comments: | CPR in progress in Ambulance. Manual ventilations at 18. | | | | | | | | |
| Taken by: | ROGGE, BRIAN | | | | | | | | |
| 06/27/2014 14:00 | | 0 Automated Cuff | | | 12 BVETT, Irregular | | 10mm Hg | | |
| Cardiac Rhythm=Asystole | | | | | | | | | |
| Taken by: | MOWRY, CADE | | | | | | | | |
| 06/27/2014 14:05 | | 0 Automated Cuff | | | 12 Invasive Mechanical Ventilation, Irregular | | 10mm Hg | | |
| Temp=89.5 F (31.94 C) | | | | | | | | | |
| Cardiac Rhythm=Asystole | | | | | | | | | |
| Comments: | Esophageal temp probe. | | | | | | | | |
| Taken by: | MOWRY, CADE | | | | | | | | |
| 06/27/2014 14:14 | | 84/51(62) Automated Cuff | | | 12 BVETT, Irregular | | 9mm Hg | | |
| Temp=89.2 F (31.78 C) | | | | | | | | | |
| Cardiac Rhythm=Asystole | | | | | | | | | |
| Comments: | Esophageal Temp probe. Blood pressure with CPR | | | | | | | | |
| Taken by: | MOWRY, CADE | | | | | | | | |

### VENTILATOR FLOWSHEET

[AC]
KANE,JOSEPH   '64
M
06/27/14

50
J207051
J5138957

### CREW INFORMATION

| Crew # | Name | Crew # | Name |
|---|---|---|---|
| 271 | ROGGE, BRIAN | 449 | MOWRY, CADE |

x _B.I. Rogge..... RN_                x _Cade Mowry RT_

| JOSEPH KANE | DOB. | .564 (50 yrs) | Run #: 4724 | Page 6 of 7 |
|---|---|---|---|---|

STJOSEPH 00020

Jun. 28. 2014 10:58AM                                              No. 1202   P. 8



STJOSEPH 00021

Patient Name: Kane, Joseph R.

## Prehospital Care Report

**Lewiston Fire Department**
1245 Idaho Street
Lewiston, ID 83501

Incident Date: 06/27/2014                    Call #: 116841                    Patient Care #: 1

### Patient Information

**Name:** Kane, Joseph R.

**Address:**

| | |
|---|---|
| **Age:** 50 Years | **D.O.B:** (mm/dd/yyyy) |
| **Gender:** Male | **SSN:** |
| **Weight:** KG / LB | **Race:** Not Known |
| **Phone:** | **Ethnicity:** Not Known |

**Closest Relative/Guardian**
Name: ,
Address:   Not Applicable, Not Applicable

**Relationship:** Not Applicable
Phone #:

### Provider Impression

**Primary Impression**
Cardiac Arrest

**Secondary Impression**
Not Applicable

### Narrative

**Summary of Events**

Cc: 50 y/o Male in cardiorespiratory arrest after drowning accident

Hx: The pt was rafting and was thrown out in the middle of a rapid. Pt was wearing a lifejacket and helmet, water was 60 degrees.  The rafting guide stated that when he was retrieved from the water he had a faint pulse and was not breathing.  They started CPR immediately and flagged down a jetboat to take them down river.  They arrived at the boat launch about an hour after he went into the water and made the 911 call from there. About 10 minutes prior to our arrival an AED was placed on the pt along with a nasopharyngeal airway.  We arrived onscene about 1.5 hours from the time of the incident.

Ex: We found the pt laying on the floor of a jet boat at the boat launch. HEENT- untraumatic, airway is patent, Neck- no JVD or tracheal deviation, Chest- EKG- Asystole, Respiratory-pt is apneic, Abdomen- soft and non-tender Skin- cyanotic and cool, Neuro- unresponsive,

Tx: We allowed bystanders to continue CPR while we placed him on a backboard and lifted him from the jetboat to the gurney.  While in back of the ambulance CPR was continued. He was intubated(confirmed by lung sounds, lack of gastric sounds and colormetric device) and an IO was established. He was given two doses of EPI with no response. Rewarming was started by warm IV fluid and placing warmed NS bags in his armpits and groin. A physical exam  was performed including vitals. The pt was transferred to a Nadstar helicopter and transported to SJRMC.

### Prior Aid

| Prior Aid | Performed By | Outcome |
|---|---|---|
| | N/A | N/A |

### Past Medical History

| | Generic Name | Description |
|---|---|---|
| MEDICATION ALLERGIES | | |
| **Patient Medications** | Generic Name | Dosage |

**Medical Surgery History**
Not Applicable

| History Primarily Obtained From | Pregnancy | Advanced Directives | Practitioner Name |
|---|---|---|---|
| Not Applicable | N/A | Not Known | |

### Assessment Exam

13:27   Skin: Cold, Cyanotic, ;

13:27   Mental Status: Unresponsive, ;

### Patient Condition

**Chief Complaint:** Drowning victim X  Not Applicable
**Secondary Complaint:**
   **Alcohol/Drug Use:** No Apparent Alcohol/Drug Use

| Injury Onset | Injury Cause | Injury Mechanism | Injury Intent | Ht. of Fall |
|---|---|---|---|---|
| 12:00 06 /27/2014 | Not Applicable | Not Applicable | Not Applicable | |

| Primary Symptom | Other Associated Symptoms |
|---|---|
| CardioRespiratory Arrest | Not Known |

Inc. Date: 06/27/2014                    Patient Name: Kane, Joseph R.                    Lewiston Fire Department                    Page: 1
Incident #: 116841                    Call #: 116841                                        Date Printed: 12/01/2014 11:26

Page 172                                                                                                            STJOSEPH 00022

Patient Name: Kane, Joseph R.

## Patient Vitals

| Time | B/P | Pulse | Rhythm | Resp. | Effort | SpO2 | SpO2 Qual. | EtCO2 | GCS | Pain | Stroke Scl | PTA | B.G. | RTS | Limb | Patient Position |
|------|-----|-------|--------|-------|--------|------|-----------|-------|-----|------|-----------|-----|------|-----|------|------------------|
| 13:26 | | | | 41 | Rm. Air | | | | 3 | | | | | | | |

## ECG Monitor

| Time | ECG Type | ECG Lead | ECG Interpretation | | ECG Ectopy | | Cause For Change |
|------|----------|----------|--------------------|--|------------|--|------------------|
| 13:31 | Not Applicable | N/A | Asystole | | N/A | | N/A |

## Procedures and Treatments

| Time | Crew | Name | Location | Size of Equipment | Attempts | Response | Success | Comments |
|------|------|------|----------|-------------------|----------|----------|---------|----------|
| 13:30 | KO | CPR  Cardiopulmonary Resuscitation | N/A | | 1 | N/A | Yes | |
| 13:31 | JO | Cardiac Monitor | N/A | | 1 | N/A | Yes | |
| 13:33 | WW | Airway-Suctioning | N/A | | 1 | N/A | No | |
| 13:34 | JO | Venous Access-Extremity | N/A | 16 g | 1 | N/A | Yes | |
| 13:35 | WW | Airway - Endotracheal Intubation | N/A | 8.0 | 1 | N/A | Yes | |
| 13:42 | JO | Venous Access-Intraosseous Adult | Tibia Distal IO-Left | | 1 | N/A | Yes | |

## Intubation Confirmation

| Time | PreoxY | Gastric Sounds | Lung L/R | Chest L/R | Wave Form | ETCO2 Numeric | ETCO2 Color | Verify Tube | EDD Draws Back EDD | Inflates | EDD | Misting | POGO Score | Secured | Tube Depth At | Depth | Tube size | Verify X-Ray | MD/RN Verify | Placement |
|------|--------|----------------|----------|-----------|-----------|---------------|-------------|-------------|--------------------|----------|-----|---------|------------|---------|---------------|-------|-----------|-------------|-------------|-----------|
| 13:35 | | | / | / | | | | | | | | | Not Applicable | Not Applicable | | | 8.0 | | | |

## Medication Administered

| Time | Crew | Medication | Route | Dosage | : | Response | PTA | Comments |
|------|------|------------|-------|--------|---|----------|-----|----------|
| 13:45 | WW | Epinephrine 1:10,000 | Intravenous | 1.0 MG | | Unchanged | N/A | |
| 13:53 | WW | Epinephrine 1:10,000 | Intravenous | 1.0 MG | | Unchanged | N/A | |

## Injury Details

## Cardiac Arrest Data

Cardiac Arrest Witnessed by: Witnessed by Lay Person
Time of First CPR: 12:15
Initial Cardiac Rhythm: Not Applicable
Pre-Ambulance AED: First Responder with AED
Time of First Defibrillatory Shock:
Return of Circulation: No
Resuscitation Attempted: Initiated Chest Compressions

Cardiac Arrest Etiology: Not Known
Pulse With Pre-Ambulance AED: Not Applicable
Rhythm at Destination: Not Applicable

CPR Discontinued at:

## Patient Safety Equipment Used

Not Applicable

## Patient Transport/Positioning

Patient Moved To Ambulance

Not Applicable

Patient's Position In Transport

Not Applicable

Patient Moved From Ambulance

Not Applicable

## Call Type and Location

Call Type: Drowning
Resp. Mode: Lights and Sirens
Urgency: Immediate
Response: 911 Response
Location: Lake, River, Ocean
Address: 35665 Snake River Road
Asotin, Asotin, WA 99402

## Call Disposition

Disposition: Treated, Transported by Other EMS Agency
Resp. Mode: Not Applicable
Destination: St Joseph's Regional Medical Center, 415 Sixth St., Lewiston, ID 83501
Dest. Determ.: Protocol
Diverted From: Not Applicable
Response Delay: None
Scene Delay: None
Transport Delay: None

## Response Times and Mileage

1st Resp. Arr.:
PSAP:
Disp. Notified: 12:57
Unit Disp.: 12:57
Enroute: 17:58
At Scene: 13:25
At Patient: 13:26
Depart:
Arrive Dest:
In Service: 15:22
In Quarters:
Cancelled:

Incident #: 116841
Call Sign: N/2
Veh. #: 1FDUF4GTSCEC12631
Start Miles:
Scene Miles:                    To Scene:

Dest. Miles:                    To Dest:

End Miles:                    To End:

Inc. Date: 06/27/2014
Incident #: 116841

Patient Name: Kane, Joseph R.
Call #: 116841

Lewiston Fire Department

Page: 2
Date Printed: 12/01/2014 13:26

Page 173

STJOSEPH 00023

JO

TIME: _____ DATE: _____      Patient Name: _____      DOB: _____

MEDIC: _____ AGENCY: LFD: ☐ OTHER: _____ UNIT#: _____
AGE: _____   SEX: ☒ MALE   ☐ FEMALE   WEIGHT: _____ KG/LBS   CODE STATUS: _____

_drowning   full might_

CHIEF
COMPLAINT _____ _W unheated 90° F._ _____

_____ TEMP: _____ B.G.: _____     E.T.A.

10

## VITAL SIGNS

| TIME | BP | P | R | MONITOR | SAO2 |
|------|-----|-----|-----|---------|------|
|      |     |     |     |         |      |
|      |     |     |     |         |      |
|      |     |     |     |         |      |
|      |     |     |     |         |      |

Trauma Glasgow Coma Score: _____

### PREHOSPITAL CARE

02: _____   N.C ☐      Non-Rebreather ☐      Bag Valve Mask: ☐      Intubated: ☐

**Circulatory**
IV:   ☐ Yes   ☐ No   Amount Infused: _____ _____ g _____ site
**Skeletal Traction Device/Site** _____
Backboard ☐      C-collar ☐
**Medications**

| Time | Drug | Route |
|------|------|-------|
|      |      |       |
|      |      |       |
|      |      |       |
|      |      |       |

☐ TC   ☐ TA
**Trauma Alert Criteria**
☐  Flail chest
☐  Multiple fractures
☐  High-risk auto crash
☐  Death of same-car occupant
☐  Ejection (partial or complete) from automobile
☐  Intrusion >12 inches occupant site or >18 inches any site
☐  Vehicle telemetry data consistent with high risk of injury
☐  Fall equal to or greater than 20 feet
☐  Pedestrian hit at equal or greater than 20 mph or thrown greater than 15 feet
☐  Motorcycle/ATV crash >20 mph or ATV roll-over

**Trauma Code Criteria**
☐  Hypovolemic shock, systolic blood pressure <90 mmHg in adults
☐  Neck, chest, and abdominal injuries which may require immediate surgical intervention
☐  Penetrating injuries, including gunshot wound, stabbing or impaled objects, to neck, chest, abdomen or pelvis
☐  Transferred patient from other hospital receiving blood to maintain vital signs
☐  Anticipated arrival of greater than three seriously injured patients
☐  Unable to intubate in pre-hospital setting with suspected need for surgical airway
☐  Age-specific hypotension in children
☐  Pediatric pedestrian versus car
☐  Pediatric falls greater than three times their height
☐  Pediatric patients with significant trauma to abdomen or chest
☐  Penetrating head injury, including isolated GSW to the head

Signature _____

**ST. JOSEPH REGIONAL MEDICAL CENTER**
Lewiston, Idaho
**EMERGENCY DEPARTMENT**
**PRE HOSPITAL CARE RADIO FORM**
0005829  04/22/13 er

[AC]
DOE,JOHN
M
06/27/14

50
J207051
J5138957

STJOSEPH 00024



**St. Joseph**
Regional Medical Center
*People committed to life*
Member of ASCENSION HEALTH

Telephone (208)743-2511
P.O. Box 816
415 Sixth Street
Lewiston, Idaho 83501-0816

☐ Care of Deceased Patient Completed

_____   _____   _____
Signature                    RN       Date/Time

# Authorization for Release of Body to Funeral Home

I, *Gary L. Gillian* _____ bearing the relationship of *N E Z Perce Co. Coroner*

*Doe John* _____, a patient recently deceased in St. Joseph Regional Medical Center,

hereby authorize the representatives of said hospital to release the remains to *VaSSar - Rawls*

_____ Mortuary.

Witness: *Jri Daw RN* _____        *Gary L. Sell* *N P C corner*
                                       Signature of Relative

Witness: _____        _____
                                       Name of Attending Physician

---

I certify that the remains of the above named patient was, after proper identification, received by me

*[signature]*                                *Vossar Rawls Funrl Hane*
Signature of Mortician                        Name of Funeral Home

---

Date/ Time of Death _____

Person Notified of Death _____
                         Relationship              Phone Number --- Call Made By

High Risk Factors: _____

Duplicate Form
White copy for Chart. Yellow copy for Mortuary.
Both copies must be signed by Relative.
Both copies should be signed by Mortician.

**ST. JOSEPH REGIONAL MEDICAL CENTER**
**Lewiston, Idaho**

**RELEASE OF BODY TO FUNERAL HOME**

PATIENT NAME & ADDRESS

*Joseph Kane*

[AC]                                    50
DOE,JOHN                          J207051
M                                J5138957
06/27/14

0000832   02/13/01   LJN   pcs

STJOSEPH 00025

# EXHIBIT 21



**Nez Perce County**
**Coroner's Office**

1310 F Street
Telephone 208-799-3074
P.O. Box 896
Lewiston, Idaho 83501
Fax    208-746-2084

# Coroner's Report

**Name:**      Kane, Joseph Russell
**Case #:**    14-238
**Date:**      6/27/2014

**Narrative:  received a call from the nursing supervisor at St. Joseph's regional medical Center of a deceased person in the emergency room. The time of this call was approximately 1436 hrs.**

Upon arrival I met with Sgt. Martin from the Nez Perce County Sheriff's office and the medical staff who stated that the deceased person's name is unknown. I found the deceased in trauma room one covered with a white sheet. The deceased had no clothing on. And ET tube was established in place, a nasal trumpet was in place, a nasogastric tube was in place, monitor pads were present as was defibrillator pads. An I/O was found on the left lower leg. No other marks were found on the deceased.

At this time the coroner's office does not know the name of the deceased, the age of the deceased, birthdate of the deceased or next of kin. Nez Perce County Sheriff's office does not have any of this information either. They're trying to contact Epley's rafting in riggins Idaho who appeared to be the owners and guides for the rafting trip, to gather information about the deceased person and next of kin.

At this point in time the body has been taken to Vassar Rawls funeral home where the corners office has put a hold on the body until further information is available.

According to law enforcement, the incident took place on the salmon River at a place called the slide. According to the Sheriff's office' the guide stated that the raft had struck a rock or something, and then folded up into a Taco position. When the raft unfolded it through several people out into the water. After they had retrieved some of the other people have been thrown into the water they found the deceased floating in an eddy. He stated that the deceased was wearing a life preserver and an helmet. After they pulled him from the water it was stated that they cut the helmet and the life preserver off. The medical staff stated that CPR was started while on the raft and continued down to on the snake River, where a power boat had stopped and picked up the deceased person and four other people. The power boat took everybody down to Heller bar where Med STAR was called to transport St. Joseph's regional medical center.

COPY

New Section 2 Page 31

At 1655 hours I was contacted by a female who stated that her and her husband was the owners of Epley's Rafting. She stated that the business Forman was on his way to Lewiston with information.

I received an phone call from Ms. Connie Zeller who stated that her and her husband were the owners of Epley's rafting. She stated that the general manager of the business would be contacting the corners office with information. I was then notified by the general manager through cell phone service, that the deceased's name is Joseph, Russell Kane (        964). The son, that was with his father on the rafting trip knew that his father was deceased.

At approximately 2005 hours I was notified that the wife Stacy Kane had been notified. . I later spoke with Stacy, who stated that her husband was a firefighter in Seattle. She also stated that her husband did not have any medical issues. Stacy was notified that her husband was a Vassar Rawls funeral home here in Lewiston. I was also informed that the rafting trip was a Boy scout outing.

I spoke with Marlene Schaefer a representative from the Boy Scouts of America who gave me statements from all the participants in the rafting trip.

After reviewing all records available to me, interviews with law enforcement, medical staff, it appears that Joseph's death was accidental and manner and the cause of death was a sudden cardiac arrhythmia due to rejection from a raft into cold water.

Gary Gilliam  - Nez Perce County coroner



# EXHIBIT 22

# STATE OF IDAHO
## CERTIFICATION OF VITAL RECORD

Item 27a Amended 7-23-14 kga

### STATE OF IDAHO
IDAHO DEPARTMENT OF HEALTH AND WELFARE
BUREAU OF VITAL RECORDS AND HEALTH STATISTICS

State of Idaho
**CERTIFICATE OF DEATH**

DATE FILED BY STATE REGISTRAR: 07/09/2014    STATE FILE NO. 2014-06282    Local Reg. No.

ONLY A COPY OF THIS DOCUMENT CERTIFIED BY THE STATE REGISTRAR WITH THE DEPARTMENT OF HEALTH AND WELFARE SEAL IS OFFICIAL. PLEASE QUESTION PRIMA FACIE EVIDENCE OF THE DEATH UNDER IDA 39-264 AND IDA 27a 39-262 CODE

**DECEDENT**

| 1. DECEDENT'S LEGAL NAME (Include AKA's if any) (First, Middle, Last, Suffix) | 2. SEX | 3. SOCIAL SECURITY NUMBER |
|---|---|---|
| JOSEPH RUSSELL KANE | MALE | ^353 |

| 4a. AGE-Last Birthday | 4b. UNDER 1 YEAR | 4c. UNDER 1 DAY | 5. DATE OF BIRTH (Mo/Day/Yr) | 6. BIRTHPLACE (City and State, Territory, or Foreign Country) |
|---|---|---|---|---|
| 50 (Years) | Months Days | Hours Minutes | ^64 | SEATTLE, WASHINGTON |

| 7a. RESIDENCE - STATE OR FOREIGN COUNTRY | 7b. COUNTY | 7c. CITY OR TOWN |
|---|---|---|
| WASHINGTON | KITSAP | POULSBO |

| 7d. STREET AND NUMBER | 7e. APT. NO. | 7f. ZIP CODE | 7g. INSIDE CITY LIMITS? |
|---|---|---|---|
| 28811 GRESHAM PLACE NE | | 98370 | ☒ Yes ☐ No |

| 8. MARITAL STATUS AT TIME OF DEATH | 9. SURVIVING SPOUSE'S NAME (If wife, give maiden name) |
|---|---|
| ☒ Married ☐ Married, but separated ☐ Widowed ☐ Divorced ☐ Never married ☐ Unknown | STACIE LEE PHELAN |

**PARENTS**

| 10. EVER IN U.S. ARMED FORCES? ☐ Yes ☒ No | 11a. FATHER'S NAME (First, Middle, Last, Suffix) THOMAS EDMUND KANE | 11b. BIRTHPLACE (State, Territory, or Foreign Country) NORTH DAKOTA |
|---|---|---|
| | 11c. MOTHER'S MAIDEN NAME (First, Middle, Last, Suffix) MARGARET ANN RINGERING | 11d. BIRTHPLACE (State, Territory, or Foreign Country) ILLINOIS |

**INFORMANT**

| 12a. INFORMANT'S NAME (Type or print) STACIE LEE KANE | 12b. RELATIONSHIP TO DECEDENT WIFE | 12c. MAILING ADDRESS (Street and Number, City, State, Zip Code) 28811 GRESHAM PLACE NE POULSBO, WA 98370 |
|---|---|---|

**DISPOSITION / MORTICIAN**

| 14. METHOD OF DISPOSITION ☐ Burial ☐ Cremation ☐ Donation ☐ Entombment ☐ Removal from Idaho ☐ Other (Specify) | 15. PLACE OF DISPOSITION (Name and address of cemetery, crematory, other place) KANE CEMETERY BAINBRIDGE ISLAND, WASHINGTON 98110 | 16. NAME AND COMPLETE ADDRESS OF FUNERAL FACILITY VASSAR-RAWLS FUNERAL HOME 920 21ST AVENUE LEWISTON, IDAHO 83501 |
|---|---|---|

| 17a. SIGNATURE OF FUNERAL SERVICE LICENSEE OR PERSON ACTING AS AGENT ▶ ELECTRONICALLY FILED: DENNIS W. HASTINGS | 17b. LICENSE OF (licensee) M0791 | 18. WAS CORONER CONTACTED DUE TO CAUSE OF DEATH? |
|---|---|---|

**PLACE OF DEATH**

| 19a. IF DEATH OCCURRED IN A HOSPITAL: ☐ Inpatient ☐ ER/Outpatient ☐ DOA | 19b. IF DEATH OCCURRED SOMEWHERE OTHER THAN A HOSPITAL: ☐ Hospice facility ☐ Nursing home/Long term care facility ☐ Decedent's home ☒ Other (Specify) SALMON RIVER |
|---|---|

| 20. FACILITY NAME (If not facility, give street and number) 45.52.97  116.44.434 | 21. CITY, TOWN, OR LOCATION OF DEATH, AND ZIP CODE LEWISTON, ID 83501 | 22. COUNTY OF DEATH NEZ PERCE |
|---|---|---|

**DATE OF DEATH**

| 23. DATE OF DEATH (Mo/Day/Yr) (Spell month) June 27, 2014 | 24. TIME OF DEATH Estimated 11:00 - 12:00 | 25. DATE PRONOUNCED DEAD (Mo/Day/Yr) (Spell month) June 27, 2014 | 26. TIME PRONOUNCED DEAD (24V) 14:25 |
|---|---|---|---|

**CAUSE OF DEATH**

V446

27. CAUSE OF DEATH
PART I. Enter the chain of events—diseases, injuries, or complications—that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. Enter only one cause on a line.

| | | Approximate interval Onset to Death |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) ⟶ | SUDDEN CARDIAC ARRHYTHMIA - DROWNING | MINUTES |
| | DUE TO (or as a consequence of): | |
| Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE LAST (disease or injury that initiated the events resulting in death) | EJECTION FROM RAFT INTO COLD WATER | MINUTES |
| | DUE TO (or as a consequence of): | |
| | DUE TO (or as a consequence of): | |

PART II. Enter other significant conditions contributing to death, but not resulting in the underlying cause given in Part I
GOUT - SLEEP APNEA - HIP REPLACEMENT

| 28. WAS AN AUTOPSY PERFORMED? ☐ Yes ☒ No | 29. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH ☐ Yes ☐ No |
|---|---|

| 29. DID TOBACCO USE CONTRIBUTE TO DEATH? ☐ Yes ☐ Probably ☒ No ☐ Unknown | 30. IF FEMALE (Aged 10-54): ☐ Not pregnant within past year ☐ Pregnant at time of death ☐ Not pregnant, but pregnant within 42 days of death ☐ Not pregnant, but pregnant 43 days to 1 year before death ☐ Unknown if pregnant within the past year | 31. MANNER OF DEATH ☐ Natural ☒ Accident ☐ Suicide ☐ Homicide ☐ Pending Investigation ☐ Could not be determined |
|---|---|---|

**ITEMS 32-34 TO BE USED FOR EXTERNAL CAUSES ONLY / FOR CORONER**

| 32. DATE OF INJURY (Mo/Day/Yr) (Spell month) June 27, 2014 | 33. TIME OF INJURY Estimated 11:00 - 12:00 | 34. PLACE OF INJURY (Decedent's home, farm, street, construction site, nursing home, restaurant, forest, etc.) RIVER | 35. INJURY AT WORK? ☐ Yes ☒ No |
|---|---|---|---|

| 36. LOCATION OF INJURY: State IDAHO | City/ Town or County LEWISTON, NEZ PERCE | Zip Code 83501 |
|---|---|---|
| Street and Number or Location 45.52.97  116.44.43 | | Apartment Number |

37. DESCRIBE HOW INJURY OCCURRED: IF TRANSPORTATION INJURY, STATE THE TYPE(S) OF VEHICLE(S) INVOLVED (Automobile, plane, motorcycle, ATV, bicycle, etc.) SPECIFY WHICH VEHICLE DECEDENT OCCUPIED, if applicable
RAFTING DOWN SALMON RIVER, EJECTED FROM RAFT INTO COLD WATER

| TRANSPORTATION INJURY ONLY | 38a. WAS DECEDENT: ☐ Driver/Operator ☐ Passenger ☐ Pedestrian ☐ Other (Specify) | 38b. WHAT SAFETY DEVICE(S) DID DECEDENT USE/EMPLOY? ☐ Air bag ☐ Seat belt ☐ Child safety seat ☐ Helmet ☐ All Ways ☐ None ☐ Unknown |
|---|---|---|

**CERTIFIER**

| 39a. CERTIFIER (Check only one, based on official capacity for this certificate) ☐ PHYSICIAN ☐ PHYSICIAN ASSISTANT ☐ ADVANCED PRACTICE PROFESSIONAL NURSE —To the best of my knowledge, death occurred at the time, date, and place, and due to the cause(s) and manner(s) stated ☐ CORONER —On the basis of examination and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner stated. Signature and Title of Certifier ▶ ELECTRONICALLY SIGNED: GARY L. GILLIAM | 39b. LICENSE NUMBER | 39c. DATE SIGNED 7 / 9 / 2014 MM DD YYYY |
|---|---|---|

| 39d. NAME, ADDRESS, AND ZIP CODE OF CERTIFIER (Type or print) GARY L. GILLIAM, PO BOX 896 LEWISTON, ID 83501 | 40b. DATE SIGNED 7 / 9 / 2014 MM DD YYYY |
|---|---|

**REGISTRAR**

| 40a. REGISTRAR'S SIGNATURE  *James B. Gillette* | 40b. DATE SIGNED 7 / 9 / 2014 MM DD YYYY |
|---|---|

This is a true and correct reproduction of the document officially registered and placed on file with the IDAHO BUREAU OF VITAL RECORDS AND HEALTH STATISTICS.

DATE ISSUED:  JUL 2 4 2014

This copy not valid unless prepared on engraved border displaying state seal and signature of the Registrar.

*James B. Gillette*
JAMES B. AYDELOTTE
STATE REGISTRAR

VSN 0-0918-4-8012


GREAT SEAL OF THE STATE OF IDAHO


THE STATE OF IDAHO

KANE 00002

Page 180



KANE 00003

# EXHIBIT 23

DEPOSITION OF JAY HUNTER, M.D. -- DECEMBER 28, 2015

Page 1

```
 1                 UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF IDAHO
 2
      The ESTATE OF JOSEPH R.    )
 3    KANE, deceased; STACIE     )
      KANE, individually, and as)
 4    guardian of JOSEPH P.      )
      KANE; and THOMAS KANE,     )
 5    individually,             )
                                 )Case No. 3:15-cv-00105-EJL
 6               Plaintiffs,     )
      vs.                        )
 7                               )
      EPLEY'S, INC., an Idaho    )
 8    Corporation,               )
                                 )
 9               Defendant.      )
      _____)
10

11

12               DEPOSITION OF JAY HUNTER, M.D.
             TAKEN ON BEHALF OF THE DEFENDANT
13                   AT MOSCOW, IDAHO
             DECEMBER 28, 2015, AT 10:45 A.M.
14

15

16

17

18

19

20

21

22

23    Reported by Nancy K. Towler, CSR, Notary Public

24

25
```

DEPOSITION OF JAY HUNTER, M.D. -- DECEMBER 28, 2015

Page 42

1    A. -- to make that determination.
2    Q. So you couldn't determine --
3    A. No.
4    Q. -- if -- if he had swallowed water to drown or
5 not, correct?
6    A. No. And there's this concept of dry drowning. A
7 certain number of people --
8         THE REPORTER: I'm sorry, I'm having trouble
9 hearing you.
10        THE WITNESS: There's -- I'm sorry. There's
11 a concept of a thing called dry drowning. A certain
12 percentage of people have what's called a laryngospasm,
13 which means the aspiration of water, so they drown, but
14 there's no water in the lungs.
15 BY MR. CRONIN:
16    Q. Right. That would be a situation where a person
17 that -- where their larynx closes --
18    A. Right.
19         MR. FREY: Object to the form of the
20 question.
21         MR. CRONIN: Yeah. Let me ask it again.
22 BY MR. CRONIN:
23    Q. When a person has laryngospasm --
24    A. Laryngospasm, yeah.
25    Q. Okay.

Page 43

1    A. Laryngospasm.
2    Q. Thank you. What occurs in the body?
3    A. They can't breathe. You know, I think that's --
4 the concept of dry drowning has been questioned recently
5 and if it really happens that often. But that's --
6 that's the traditional teaching is, occasionally people
7 who drown do not have a lot of water in the lungs.
8    Q. And in this particular case here, there is no
9 test of measurement as to whether Mr. Kane had any water
10 in his lungs?
11    A. No. We didn't perform any. And -- and there's
12 really nothing we could have done to determine that.
13    Q. Right. Okay. And you've not seen any evidence
14 that would indicate that he had had water in his lungs?
15    A. There wouldn't be any evidence.
16    Q. Right. For example, was -- is -- if Mr. Kane had
17 vomited on scene after being in the water, would that be
18 a significant thing?
19    A. No, because vomiting comes from the stomach.
20    Q. Okay.
21    A. Yeah.
22    Q. All right. If he had ejected water out of his
23 mouth, would that have --
24    A. I suppose if that was noted by the --
25    Q. Yeah.

Page 44

1    A. But that's -- but, again, that usually is not
2 something that's noted when people drown.
3    Q. Okay. I've got a few more questions, but I want
4 to -- I want to clarify a couple points. Number one,
5 and this might be a little tedious, but it is my
6 understanding that you are saying, as the doctor that
7 attended Mr. Kane, that there was no way for you to
8 determine a medical cause of death on a
9 more-probable-than-not basis?
10        MR. FREY: I'm going to object to the form
11 of the question. You can go ahead and answer it.
12        THE WITNESS: Most probable?
13 BY MR. CRONIN:
14    Q. Yes.
15    A. Well, the most probable thing is he drowned.
16    Q. Okay. Meaning what?
17    A. Meaning he was thrown out under water for ten
18 minutes, came out with no pulse. So I mean, just by
19 probability, he drowned.
20    Q. Okay.
21    A. I mean, you can -- you know, I can't exclude that
22 he had a cardiac arrest before he drowned.
23    Q. Right.
24    A. I see that on car accidents when somebody's head
25 is smashed in. I can't say that they did not have a

Page 45

1 cardiac arrest before they had the accident --
2    Q. Right.
3    A. -- but the most probable thing is they died as a
4 result of the accident.
5    Q. And with respect to any -- any subjective
6 information -- well, excuse me. Strike that. In part,
7 what you're basing what you just told me on, based on
8 subjective information, he was submerged for ten
9 minutes --
10    A. Right.
11    Q. -- is that correct?
12    A. Correct.
13        MR. FREY: Object to the form of the
14 question.
15        THE REPORTER: I'm sorry, I need you all to
16 speak one at a time. You are all jumping in at the same
17 time.
18        (DISCUSSION HELD OFF THE RECORD.)
19        MR. FREY: Just briefly for a minute,
20 counsel is speaking quickly. And before you answer, at
21 least give me a chance to voice my objection. Then you
22 may go ahead and answer, but it just prohibits him from
23 using it in some other way if it's an improper question.
24 BY MR. CRONIN:
25    Q. Not saying it is an improper question --

12 (Pages 42 to 45)

DEPOSITION OF JAY HUNTER, M.D. -- DECEMBER 28, 2015

Page 46

1    A. Sure.
2    Q. -- but what I understand is that -- is that you
3 are -- the information that you just offered me is based
4 on the subjective information, in part, that Mr. Kane
5 was underwater submerged for ten minutes?
6    A. Yes. It's -- it's all information I received
7 from -- I guess in law you call it hearsay.
8    Q. Yeah.
9    A. Information from the paramedics from the
10 helicopter crew saying, here's what happened. Yeah.
11   Q. And, in fact, if -- if he wasn't submerged for
12 ten minutes, then -- then what would your conclusion be?
13   A. If he was never submerged?
14   Q. How about if he was never submerged for any --
15 any period of time?
16   A. Then my conclusion would be he must have died
17 from arrhythmia. And then you can speculate as to the
18 cause of the arrhythmia.
19   Q. Yeah. All right. But there's no way of
20 medically determining at this point, particularly since
21 Mr. Kane did not have an autopsy, how he died; is that
22 correct?
23   A. True. And -- and, quite frankly, an autopsy may
24 not help.
25   Q. May not have helped?

Page 47

1    A. Yeah.
2    Q. And, further, the fact that there's been
3 cremation doesn't mean -- means that we could not go
4 back and do any forensic work on his body, correct?
5    A. Yeah.
6    Q. Okay. A few questions. Mr. Kane's medical
7 record -- and I have them here if you'd like to see
8 them -- indicated -- indicate that he was diagnosed with
9 PMH sleep apnea slash CPAP on November 17th, 2013,
10 approximately seven months before he died. What does
11 that mean, sleep apnea slash CPAP?
12   A. Well, sleep apnea is a condition where, when you
13 sleep, you stop breathing long enough for your oxygen
14 saturation to go quite low. And, of course, there are
15 degrees. There are people who just don't sleep very
16 well and people who develop long-term complications
17 depending on the severity of the sleep apnea.
18   Q. Okay. If a person has been diagnosed with sleep
19 apnea, are they more likely to go into an arrhythmia?
20   A. You know, I can't really answer that. If they
21 have sleep apnea and hypoxia to the extreme that they
22 develop pulmonary hypertension, a long-term condition,
23 then yes.
24   Q. Okay.
25   A. But that's a lot of ifs.

Page 48

1    Q. Mr. Kane was also diagnosed as having
2 hypertension. And so he had hypertension in the context
3 of having sleep apnea. He also is diagnosed as having
4 hyperlipidemia.
5    MR. FREY: I'm going -- I'm going to object
6 to the form of the question. You're -- you're reading
7 your expert's conclusions as -- as opposed to the
8 medical records. But go ahead.
9 BY MR. CRONIN:
10   Q. To clarify, if you would like to see the medical
11 records, the first one that was provided is Kane's
12 record 0004, where there's a diagnosis of sleep apnea.
13   MR. FREY: Okay. If you want to show it to
14 him, that's fine.
15 BY MR. CRONIN:
16   Q. This will be a little -- a little awkward. We
17 can go back and forth here.
18   A. Well, that's okay. I'll -- I'll trust that those
19 are correct diagnoses that somebody's made.
20   Q. Well, Mr. Frey --
21   A. Oh.
22   MR. FREY: They are --
23   MR. CRONIN: Hold on. The issue seems to be
24 with you. These are -- these -- we have these medical
25 records, and we can take the time to go through each of

Page 49

1 those as --
2    MR. FREY: I want the doctor to see -- if
3 you claim what it says, I want him to see the whole
4 thing in context.
5    MR. CRONIN: Oh, sure.
6    MR. FREY: I don't think it's fair to take
7 your --
8    MR. CRONIN: Sure.
9    MR. FREY: -- expert's summary.
10   MR. CRONIN: Very good.
11   MR. FREY: Just like his EKG analysis, which
12 he's not qualified to give, although he thinks he is.
13   MR. CRONIN: So you're testifying now; is
14 that right?
15   MR. FREY: Well, I'm giving you the reason
16 why I don't trust his summary.
17   MR. CRONIN: Thank you very much. Well,
18 when you -- when we put you on the stand, we'll swear
19 you in.
20 BY MR. CRONIN:
21   Q. Okay. The next thing, let's take a look here at
22 this document marked Kane 00003. Do you see that?
23   A. Yeah.
24   Q. Top left-hand corner --
25   A. Sleep apnea.

13 (Pages 46 to 49)

Nancy K. Towler, CSR, Notary Public
FLYGARE & ASSOCIATES, INC. 800-574-0414

Page 185

DEPOSITION OF JAY HUNTER, M.D.  --  DECEMBER 28, 2015

Page 58

1    Q.  I was going to say, what is a DVT?
2    A.  A DVT is a blood clot in the lower -- in the deep
3  vein, usually in the leg.  Can be in the arm, but it's
4  usually a leg.
5    Q.  Can the blood clot that's in a deep vein go -- go
6  to the brain and cause death?
7    A.  No.
8    Q.  Can it go to the lungs and cause death?
9    A.  Yes.
10    Q.  And if a blood clot goes to the lungs and caused
11  death, will a person appear kind of bluish in color?
12    A.  Yes.
13    Q.  Pardon me?
14    A.  Yes.
15    Q.  And would they appear bluish in color at the
16  shoulders and above?
17    A.  Yeah, but it's not -- yeah, but you will with
18  almost any cardiac arrest.  So...
19    Q.  Also with any other --
20    A.  Yeah.
21    Q.  -- type of cardiac arrest?
22    A.  Yeah.  I mean, it's not specific for --
23    Q.  Okay.  All right.  So could acute cardiac
24  arrhythmia have been a cause of his death?
25    A.  Sure.

Page 59

1    Q.  Could acute cerebral vascular accident like a
2  hemorrhage or an embolic clot or a thrombotic clot been
3  a cause of his death?
4    A.  Probably no, because those people don't
5  have cardiac -- I mean, they almost never have cardiac
6  arrests immediately, because people come in comatose,
7  not breathing sometimes, but not cardiac arrest.  I
8  mean, brain hemorrhage, blood clot to the brain
9  generally doesn't cause cardiac arrest.
10    Q.  Okay.  Do persons who have those blood clots that
11  go to the brain end up in cardiac arrest?
12    A.  Now, are you talking a blood clot going to the
13  brain from the legs?
14    Q.  Yes.
15    A.  It can't happen.
16    Q.  Okay.  I'm sorry then.
17    A.  The blood clot has -- the blood has to circulate
18  through the lung for --
19    Q.  Oh, okay.  How about just having a cerebral
20  vascular accident in the head?
21    A.  It can cause death, but generally doesn't
22  cause -- I mean, it's -- again, I'm outside -- you know,
23  you have to ask a pathologist.
24    Q.  I understand.
25    A.  It's not something I see.  The ones I see -- the

Page 60

1  ones I see are sill alive.  So I see -- I see a
2  selective population.  I see large cerebral hemorrhages
3  frequently.  And people don't present as cardiac
4  arrests.  Are there a subset that do?  I don't know.
5    Q.  And if -- because there was -- if a person had an
6  acute cerebral vascular accident, that could be shown on
7  CT, correct?
8    A.  That could be shown on CT, yes.
9    Q.  And could it also --
10    A.  As a hemorrhage, not -- not a -- not a clot.
11    Q.  Right.  The hemorrhage, itself?
12    A.  Yeah.  If you have bleeding in the head, it will
13  show on the CT.  If you have a huge stroke and wipe out
14  three-quarters of your brain, your initial CT is going
15  to look normal.
16    Q.  Okay.  And if a person has had an aneurysm that
17  led to their death --
18    A.  That's going to show on a CT.
19    Q.  -- that will show on CT's too?  And would that be
20  available to -- on autopsy as well?
21    A.  Yeah.
22    Q.  Okay.
23    A.  That would be seen on autopsy.
24    Q.  And I know I'm getting a little redundant here,
25  but -- of course, we're not criticizing what you've

Page 61

1  done.
2    A.  No, I understand.
3    Q.  A CT or MRI was not done to rule that in or rule
4  that out, correct?
5    A.  No.
6    Q.  So one cannot rule out the acute cardiac
7  arrhythmia as you've already talked about?
8    A.  True.
9    Q.  And one cannot rule out the acute cerebral
10  vascular accident, correct?
11    A.  True.
12    Q.  Okay.  And I think I said this already, but one
13  cannot -- you cannot also rule out an acute cerebral
14  aneurysm as Mr. Kane's cause of death?
15    A.  No.
16    Q.  Okay.  Likewise, you cannot rule out an acute
17  abdominal or thoracic aneurysm rupture?
18    A.  No.
19       (DISCUSSION HELD OFF THE RECORD.)
20  BY MR. CRONIN:
21    Q.  And, likewise, again, you can't rule out that
22  Mr. Kane had had a severe intracranial cranial traumatic
23  hemorrhage?
24    A.  No.
25    Q.  Okay.

16 (Pages 58 to 61)

DEPOSITION OF JAY HUNTER, M.D.  --  DECEMBER 28, 2015

Page 62

1    A.  No.  Yeah.
2    Q.  All right.
3    A.  I can't rule out --
4    Q.  Anything?
5    A.  -- anything.
6    Q.  Right.  And I'm getting to that point, but we
7  need for our record, Doctor, to be --
8    A.  Right.  I understand.  I understand.
9    Q.  So this is a little redundant, and I'm sorry
10  about that.
11   A.  That's all right.
12   Q.  Also you cannot rule out acute myocardial
13  infarction, correct?
14   A.  True.
15   Q.  You cannot also rule out acute unstable angina
16  atypical of sudden death?
17   A.  True.
18   Q.  Okay.  So I think I beat this horse a little bit
19  here.
20   A.  Right.
21   Q.  But my understanding is, as the physician that he
22  was presented to first post incident, that you -- that
23  he arrived dead, and -- and you were not able to
24  determine a cause of death based on what we've been
25  discussing?

Page 63

1    A.  True.
2    Q.  Okay.  And, likewise, as I've said, even with --
3  that you can't rule out these other causes of death that
4  I just listed as the reason for Mr. Kane's dying,
5  correct?
6    A.  Yeah, correct.
7    Q.  Okay.  And as I said at the beginning of the
8  deposition, there -- you cannot rule out that he died
9  before exiting the raft into the water, correct?
10   A.  Correct.
11        MR. CRONIN:  Okay.  I don't presently have
12  more questions.  Mr. Frey probably does.
13        MR. FREY:  Did you make an exhibit of the
14  EKG -- or ECG that you showed him?
15        MR. CRONIN:  You mean -- you mean the ones
16  that I -- no.
17        MR. FREY:  The ones from the medical
18  records.
19        MR. CRONIN:  Did not.
20        MR. FREY:  Okay.  Let's go ahead and mark
21  these two.
22        MR. CRONIN:  Do you have those?
23        MR. FREY:  I have them.
24        MR. CRONIN:  Okay.  These are -- Tom, I'll
25  go ahead and label these for you.  This would be --

Page 64

1        MR. FREY:  That would be Exhibit --
2        MR. CRONIN:  Five.
3        MR. FREY:  -- 5.
4        MR. CRONIN:  You want them as a two-page
5  exhibit?
6        MR. FREY:  Absolutely.
7        MR. CRONIN:  Okay.
8        MR. FREY:  And we can staple those if
9  somebody has a stapler or somehow hold them together.
10  EXHIBITS:
11        (Whereupon, Deposition Exhibit No. 5 was
12  marked for identification.)
13            EXAMINATION
14  BY MR. FREY:
15   Q.  Doctor, you were shown some EKG's or ECG's, I
16  don't know which is correct.
17   A.  Either is correct.
18   Q.  Either is correct?
19   A.  Yeah.
20   Q.  And these were taken in 2012.  And would you
21  read --
22   A.  (Inaudible).
23        THE REPORTER:  I'm sorry, I can't hear you.
24        THE WITNESS:  Oh, these were taken --
25  BY MR. FREY:

Page 65

1    Q.  These were taken in 2012.
2    A.  These were --
3        THE REPORTER:  I'm sorry, with you facing
4  away from me now, I cannot hear you.
5  BY MR. FREY:
6    Q.  Exhibit 5, if you look at it at the top, Doctor,
7  you'll see that it shows 17 October, 2012.
8    A.  Right.  8:49 and --
9    Q.  So these EKG's were done some two years --
10   A.  -- 8:58, so they're done 11 minutes apart.
11   Q.  Right.
12   A.  Yeah.
13   Q.  And would you read what it says on the first one?
14   A.  Normal sinus rhythm, normal EKG.
15   Q.  Okay.  And then on the one that is earlier,
16  8:49 --
17   A.  Right.  Normal sinus rhythm, inferior infarct,
18  age undetermined.  These are computer readings.
19  They're --
20   A.  Yeah.
21   A.  A famous cardiologist often says computers are
22  programmed like plaintiff's lawyers.  And so you should
23  ignore them, ignore the EKG readings, computer readings.
24   Q.  Do you have any experience in reading these at
25  all?

17 (Pages 62 to 65)

DEPOSITION OF JAY HUNTER, M.D. -- DECEMBER 28, 2015

Page 66

1    A.  Yes.
2    Q.  Okay.  Would you agree with me that the Q wave
3  changes on the first with a slight SET -- ST change that
4  resolved later in a situation without symptoms are
5  immaterial?
6    A.  These two EKG's are identical.  It's only the
7  computer reading that is different.
8    Q.  Okay.
9    A.  Yeah.
10    Q.  Okay.  Thank you.  Let me go back and cover a
11  couple of things.  Doctor, I'm going to give you --
12  well, first of all, I'm going to ask you, is -- when you
13  saw Mr. Kane, was your treatment that -- and evaluation
14  that you did when he got to the hospital, was his
15  condition consistent with someone who had drowned?
16    A.  Consistent with, yes.
17    Q.  With death by drowning?
18    A.  (Witness nods head.)
19    Q.  Okay.  Now, I'm going to go back for a minute.
20  I -- I want you to assume that -- the following facts:
21  This was a white water trip that started on June 24th.
22  And on the day in question, they had been going down the
23  river for approximately three days in a raft with a
24  group of people.
25    A.  Yeah.

Page 67

1    Q.  I want you to assume that, according to the lead
2  guide, Mr. Kane had not evidenced any distress or
3  medical problems or inability to function at all during
4  those first --
5    A.  Yeah.
6    Q.  -- three days.  I'm going to ask you to assume
7  that they went through a rapid that was, by the
8  defendant's own guide, labeled as a Class 5, being --
9  one being the lowest, six being the highest.
10    A.  Right.
11    Q.  I want you to assume that, as they went through
12  that slide, two of the three boats had people ejected
13  out of them into the water.  I want you to assume that
14  one of those people was Joseph Kane.  And I want you to
15  assume that the waves at the -- as they went into that
16  rapid were from 15 to 16 feet high.
17    I want you to assume that, by the testimony of
18  one of the crew from Epley's, that they saw the
19  decedent, Joe Kane, his son within a few yards of
20  themselves as -- after they were thrown out, and then
21  that they both disappeared along an eddy line.  I want
22  you to assume that the son came out first, but the same
23  guide did not see the decedent, Joseph Kane, come out
24  until later.
25    I want you to assume that the son, who survived,

Page 68

1  said that his -- they were under water -- or his father
2  was under water ten to 15 seconds or longer, but not ten
3  minutes.
4    A.  Yeah.
5    Q.  And that -- I want you to assume that when they
6  went to rescue him and make an attempt to rescue him,
7  that he was not conscious; that he did not respond to
8  the efforts to throw a bag to him to try to have him
9  hold on.
10    Based upon -- based on those facts, together with
11  what you saw from all of the records from MedStar and
12  what you saw at the hospital, can you say, on a
13  more-likely-than-not basis, that his cause of death --
14  what his cause of death was?
15    MR. CRONIN:  Objection to foundation and,
16  obviously, based on assumptions of facts not in our
17  record.
18  BY MR. FREY:
19    Q.  Okay.  You can go ahead and answer.
20    A.  Yeah.  I mean, all I can say is the patient
21  arrived to me deceased.  And, again, the assumption is,
22  if you're thrown into the water and you're alive when
23  you're thrown in and you're pulled out dead, it's
24  drowning.  And -- but beyond that --
25    Q.  Okay.

Page 69

1    A.  -- you know, you -- I just don't have the
2  information to make -- make accurate judgment.
3    Q.  Okay.
4    A.  But the assumption -- again, a car rolls over and
5  a person is dead at the scene, the assumption is it was
6  a traumatic accident.
7    Q.  Uh-huh.
8    A.  Could the person have died before the car rolled
9  over and that's what caused the accident?  Sure.  So...
10    Q.  If a person drowns, do they -- does their -- what
11  makes their heart stop?
12    A.  Lack of oxygen.  Hypoxia.
13    Q.  Okay.  And how long does it take to do that?
14    A.  Depends on the person.  An obese person, it takes
15  a very short time before they become hypoxic.  A young
16  healthy person, a lot longer.  I mean, we -- when we
17  intubate people, when we paralyze somebody to put a tube
18  in their throat, they stop breathing.  And then we have
19  so many -- so much time before their oxygen falls to a
20  critical level.
21    A healthy person who is oxygenated well, it could
22  be several minutes.  Very obese -- we've gotten research
23  now with obese people, that time can be shortened to 30
24  or 60 seconds before their oxygen reaches a critically
25  low point.  So...

18 (Pages 66 to 69)

Nancy K. Towler, CSR, Notary Public
FLYGARE & ASSOCIATES, INC. 800-574-0414

DEPOSITION OF JAY HUNTER, M.D.  --  DECEMBER 28, 2015

Page 78

1  and then -- had cardiac arrest because of the drowning?
2  Would it be significant to determine, in making any type
3  of analysis, that prior to these particular rapids that
4  they ran, he had no health difficulties or problems at
5  all during the trip?
6      A. Again, it's -- certainly, if he had been sick the
7  whole visit -- the whole trip --
8      Q. Uh-huh.
9      A. -- you'd worry -- but then people who have
10  cardiac arrest often do so suddenly without any prior
11  warning symptoms.
12     Q. All right.
13     A. So...
14     Q. Is 58-degree water cold enough to impair a
15  person's ability to -- like Mr. Kane, somebody his size,
16  to help or rescue or get out and save himself from the
17  water?
18     A. You know, again --
19     Q. If you know.
20     A. I don't really know.  It -- it depends on how
21  long you're in the -- in the water --
22     Q. Uh-huh.
23     A. -- how active you are.  Just -- there's too many
24  factors.  I wouldn't be able to answer that question.
25     Q. Is there anything that you see in any of these

Page 79

1  records or in anything that you saw when you were there
2  in the ER room that would let you -- or that would make
3  you rule out drowning as a cause of death?
4          MR. CRONIN: Object to the form.
5          THE WITNESS: No.  My -- my impression of
6  drowning is based on the --
7          THE REPORTER: I'm sorry, I can't hear you.
8          THE WITNESS: My impression -- if the
9  patient drowned, if I -- if I find that, it was based on
10  the history that I received and not by my examination.
11     Q. Okay.
12     A. I mean, the same person could have been brought
13  in with exactly the same rhythm and the same
14  condition --
15     Q. Uh-huh.
16     A. -- and they could have said he was eating dinner
17  and keeled over, and I would say, okay, he died of a
18  sudden arrhythmia.
19     Q. Uh-huh.
20     A. There's nothing -- there's nothing I'm seeing
21  from the patient in the ER.  You tell me, this person
22  primarily drowned or had the rhythm problem before he
23  drowned or the -- the paramedics made up a story and
24  they really found him on Main Street --
25     Q. Right.

Page 80

1      A. So -- yeah.
2      Q. But given the -- given the facts and information
3  that I've given you in my hypothetical, would you
4  believe that the likely cause of his death was drowning
5  as opposed to some other cause?
6          MR. CRONIN: Objection to the form of the
7  question.
8          THE WITNESS: Well --
9          MR. CRONIN: And also -- hold it.  Also
10  asked and answered.
11  BY MR. FREY:
12     Q. Go ahead.
13     A. I think I kind of answered that before.  If the
14  assumption is that somebody falls in the water and is
15  pulled out in cardiac arrest, the assumption is they
16  probably drowned.  But could something else have
17  happened?  Sure.  Just like the assumption is, a
18  four-vehicle accident rollover, the person is dead at
19  the scene, you assume that the trauma killed him.  But
20  could they have had a heart -- you know, could they have
21  had a cardiac arrest and then rolled the car?  Sure.
22     Q. So it could be, as plaintiffs' expert has gone
23  through a laundry list of things that could have
24  possibly --
25     A. Right.

Page 81

1      Q. -- happened, but is there anything in the medical
2  records or the story that you were told about what
3  happened that would indicate that any of those is -- was
4  even more likely than drowning?
5      A. Prior to this deposition?
6      Q. Yeah.
7      A. I didn't know any of this prior to the
8  deposition.
9      Q. From what you learned in the deposition --
10     A. Well --
11     Q. -- is there anything about -- let me get them
12  here for you.  Is -- given the -- the hypothetical that
13  I've told you about what happened --
14     A. Right.
15     Q. -- and my question to you, is there anything --
16  would you think that he had an acute cerebral aneurysm
17  as opposed to, given the facts I gave you, that he was
18  ejected out of a boat into a 15-foot wave and was sucked
19  under water for an indeterminate period of time?
20         MR. CRONIN: Objection to the form of the
21  question.  Also asked and answered already.
22  BY MR. FREY:
23     Q. Go ahead.
24     A. No.  And, again -- you know, when I sign death
25  certificates, I'm always asked to give the primary cause

21 (Pages 78 to 81)

# EXHIBIT 24

Page 1

1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF IDAHO
2


3


4
    The ESTATE OF
5   JOSEPH R. KANE,
    deceased; STACIE KANE,
6   individually, and as
    guardian of JOSEPH P.
7   KANE; and THOMAS KANE,
    individually,
8
             Plaintiffs,
9
    vs.                         Case No. 3:15-cv-00105-EJL
10
    EPLEY'S, INC., an
11  Idaho corporation,

12           Defendant.
    _____
13

14

15

16

17

18                              DEPOSITION OF

19                       THOMAS G. MARTIN, M.D.

20
                                     TAKEN ON
21                      WEDNESDAY, JANUARY 13, 2016
                                    10:10 A.M.
22

23                       FREY BUCK LAW OFFICES
                    1200 FIFTH AVENUE, SUITE 1900
24                     SEATTLE, WASHINGTON 98101

25

Page 30

1   that Q wave was due to a prior heart attack was
2   either an autopsy which showed a scar on that part
3   of the heart or an echocardiogram which showed
4   abnormal wall motion in that heart while the patient
5   is still alive.
6       Q.  Yes.  Okay.
7       A.  But just looking at the EKG that's a very
8   common finding.  We see it frequently in the
9   emergency department.
10      Q.  And just as a matter of point, we'll talk
11  about this a little later, an autopsy post death --
12  well, autopsies are always post death.  An autopsy
13  was not performed; correct?
14      A.  Correct.
15      Q.  And so we don't know if he had had an
16  infarct that caused heart damage prior to this
17  event; correct?
18      A.  We don't know that, yes.
19      Q.  Okay.  But if an autopsy had been done and
20  if there had been heart damage that would be a
21  typical finding on autopsy?
22      A.  Yeah, that typically you would see
23  evidence of a heart -- previous heart damage on
24  autopsy.
25      Q.  All right.

Page 31

1       A.  A scar.
2       Q.  So as compared to a very healthy male
3   without these symptoms that we've been discussing
4   for the last few minutes, would you agree with me
5   that Joseph Kane, age approximately 50 at the time
6   and 100 pounds overweight with hyperlipidemia and
7   elevated blood pressure at times and a person who is
8   -- has apenia is--
9       MR. BUCK:  Has what?
10      MR. CRONIN:  Apenia, A-P-E-N-I-A.
11      MR. BUCK:  Apnea.
12      THE WITNESS:  Apnea.
13      MR. CRONIN:  Thank you.
14      Q.  Is at higher risk than the general
15  population for sudden cardiac death?
16      A.  Well, I think -- I don't think that he had
17  -- that this hypertension was an issue.  And I'm not
18  sure about the hyperlipidemia that he had, whether
19  that was an issue or not but I think certainly there
20  is somewhat to suggest obstructive sleep apnea is.
21  A previous heart attack is. And obesity is but
22  whether of 100 pounds, whether his level of obesity
23  was significant or not I can't say.
24      Q.  Okay.  So we're back to this rule-in-and-
25  rule-out stuff.  And I'm aware that if I take a look

Page 32

1   at your discussion section that you state that you
2   feel that it is most likely that his -- that he died
3   of cardiac arrest, right?
4       A.  Well, that he had a cardiac arrest.
5       Q.  That he had a cardiac arrest.
6       A.  Yes.
7       Q.  And that you believe that that was most
8   likely due to acute myocardial infarction or a
9   primary lethal ventricular dysrhythmia.  Correct?
10      A.  Right.
11      Q.  Now, let's talk about the first--
12      A.  And I would say -- I don't know if I
13  mentioned it there but I think drowning is certainly
14  the other possibility as well.  The big three things
15  that he was underwater long enough to have drowned
16  or he suffered a heart attack or a ventricular
17  dysrhythmia as I recall.
18      Q.  So if he were underwater long enough he
19  could have drowned.
20      A.  He could have drowned.
21      Q.  But you don't have any definitive time by
22  which he was underwater; correct?
23      A.  Correct.
24      Q.  So it is a -- it's a possibility that he
25  died of drowning.

Page 33

1       A.  Yes.
2       Q.  Okay.  And it is also a possibility that
3   he did not die of drowning; correct?
4       A.  Yes.
5       Q.  Okay.  And you are not offering an opinion
6   on a more probable than not basis that he died of
7   drowning, are you?
8       A.  No.
9       Q.  Okay.  So you talk about him -- most
10  likely the cause of his death was cardiac arrest.
11  Okay?  And as I understand it that means his heart
12  essentially stops; correct?
13      A.  Yes.
14      Q.  Okay.  And you attribute that to one of a
15  couple things generally as I see in your report, the
16  first being acute meaning it happens right now.  Is
17  that right?
18      A.  Yes.
19      Q.  Okay.  Myocardial infarction, right?
20      A.  Yes.
21      Q.  Okay.  What is myocardial infarction?
22      A.  Myocardial infarction is a disease state
23  where there's actually damage to the heart that
24  occurs.  That's the infarction.  Infarction means
25  heart damage, tissue damage, as opposed to

9 (Pages 30 to 33)

Page 34

1  myocardial ischemia which you can have decreased
2  blood flow or increased work demand leading to
3  inadequate blood flow that may cause ischemia but
4  not death. Death of the heart cells is a myocardial
5  infarction.
6      Q.  Okay. And you mentioned a disease
7  process. Are you saying that he had an active heart
8  disease process going on prior to this incident?
9      A.  No.
10     Q.  Okay.
11     A.  I'm saying that if this event caused the
12  disease process to occur. Like if he were hit in
13  the head. I also mentioned that as a possibility
14  but that would be a disease process. Blunt-head
15  trauma would be a disease process.
16     Q.  Okay. All right. And just going back to
17  these two, we'll get to getting hit in the head in a
18  minute. You know, one of the possibilities of his
19  death was acute myocardial infarction; correct?
20     A.  Yes.
21     Q.  Okay. And another possibility was primary
22  lethal ventricular dysrhythmia. Is that correct?
23     A.  Yes.
24     Q.  And what is that, please?
25     A.  Well, that's similar to what this article

Page 35

1  you showed me refers to as arhythmia but it's an
2  abnormal heart rhythm that's not compatible with
3  life.
4      Q.  Okay.
5      A.  It compromises the ability of the heart to
6  pump blood to the vital tissue and vital organs.
7      Q.  What would it take from a scientific
8  standpoint to know which of these two issues, an
9  acute myocardial infarction or primary lethal
10  ventricular dysrhythmia killed Mr. Kane?
11     A.  Usually the differentiating -- the
12  distinguishing -- you distinguish between those
13  processes with either blood test and/or an autopsy.
14     Q.  All right. And as we--
15     A.  Or echocardiogram.
16     Q.  All right. Okay. And so obviously Mr.
17  Kane is dead on arrival to the Lewiston Hospital;
18  correct?
19     A.  Yes.
20     Q.  And as you know an autopsy was not
21  performed; correct?
22     A.  Correct.
23     Q.  And have you read information that
24  indicates that no blood test was done?
25     A.  I didn't see any blood test.

Page 36

1      Q.  I think, and I hope not to mischaracterize
2  this but I think that Dr. Hunter indicated that
3  obviously because he was dead he was not going to
4  run any tests. He didn't do an arterial blood gas
5  test for example because he said he couldn't. And I
6  believe there was no indication that he did any lab
7  work. Is that consistent with what you understand?
8      A.  Yeah, I'm not sure that he couldn't.
9  Maybe he didn't think it was worth the effort.
10     Q.  Yeah. Would that be the blood work or
11  ABG?
12     A.  The ABG.
13     Q.  Yeah.
14     A.  I mean I think every emergency room should
15  be able to do an arterial blood gas. It's such a
16  fundamental piece of information that you do.
17     Q.  Right. And if he had done an ABG what
18  would that tell us relative to the issues in this
19  case about drowning?
20     A.  It wouldn't really. It would just tell
21  you what his current state of oxygenation is in his
22  blood at the time it was performed.
23     Q.  Yes.
24     A.  And it would have -- it would give you
25  very little insight into as the cause of death, into

Page 37

1  the cause of death.
2      Q.  And incidentally, I'm backtracking just a
3  little bit. Dr. Hunter indicated that he did not
4  consider Mr. Kane to have died from hypothermia.
5      A.  Correct, I saw that too.
6      Q.  And do you concur with that assessment?
7      A.  It depends how cold the water was. You
8  know, I think hypothermia could have been an
9  important factor. It makes you more prone to
10  ventricular dysrhythmias. It makes you very weak
11  and less able to keep your head out of the water.
12  And I know that his body's core temperature was
13  measured somewhere along the line of found to be 90
14  degrees. So whether that was a result of him losing
15  heat as he was being resuscitated or whether it was
16  stable. But he was cold at one point. So it could
17  have been a factor. I don't think that was the
18  primary factor in causing his death.
19     Q.  Dr. Hunter, if I understand what he said,
20  indicated that the core body temperature was 90
21  degrees at arrival to Lewiston Hospital?
22     A.  Right.
23     Q.  And that was some two and a half hours
24  post incident.
25     A.  Right.

10 (Pages 34 to 37)

Page 38

1    Q.  And so as I interpret his comments it was
2  that going back in time two and a half hours and
3  knowing what treatments were given to Mr. Kane along
4  the way, that would be CPR, epinephrine, warm packs,
5  warm infusion, he did not believe that hypothermia
6  caused his death.
7    A.  Well, if he had, you know, if they had
8  tried active externally warming, which is what the
9  hot packs would be, his temperature could have been
10  even less than that.  It could have been 88, 85.
11  And at 88 you can have cardiac arrest.  So I don't
12  know that he can say that.  I think it has to be
13  considered a possibility.
14    Q.  Yes, right.
15    A.  There were some things that Dr. Hunter
16  said that I wouldn't agree with but some that I do
17  agree with.
18    Q.  What comes to your mind that you wouldn't
19  agree with?
20    A.  One thing he said.  They didn't have
21  emergency medicine residency training back when he
22  did his -- when he did his medicine training, which
23  is wrong because I was doing emergency medicine
24  residency during that time and I interviewed all
25  over the country, in and out of the country.  But I

Page 39

1  looked at all the country programs.  There were at
2  least 15 at the time he referenced.
3      There were just a few things that I
4  thought he was a little loose with his opinions in
5  regards to like the hypothermia but there were some
6  other situations, some of the statements he made
7  that I thought I would disagree with.
8    Q.  That you would disagree with?
9    A.  I would disagree with, yes.
10    Q.  And what were those?
11    A.  Again, I can't recall.
12    Q.  Was anything significant in terms of cause
13  of death or anything like that?
14    A.  No.  I don't recall that, no.
15    Q.  Okay.  Let me get back to this point here.
16  You differentiate in this differential diagnosis
17  acute myocardial infarction from primary lethal
18  ventricular dysrhythmia as you have so described in
19  your deposition today.
20    A.  Yes.
21    Q.  Are you able to say that more probably
22  than not one of those two caused his death?
23    A.  No.
24    Q.  And is there -- are you able to say that
25  both in combination caused his death?

Page 40

1    A.  It's possible.
2    Q.  Okay.  All right.  Is it probable based on
3  the information, data, and facts that you have
4  reviewed?
5    A.  Well, probable that they both did?
6    Q.  Yes, simultaneously.
7    A.  I would think that what's probable, most
8  probable would be that he died of a ventricular
9  dysrhythmia.
10    Q.  And what is that based on?
11    A.  The fact that he didn't complain to people
12  of chest pain or prior anginal-like symptoms while
13  he was in the water.  Usually with myocardial
14  infarction you don't have sudden death.  It's --
15  there's usually pain felt and then there's a period
16  where you are at risk of a secondary ventricular
17  dysrhythmia that occurs.  But they don't occur at
18  the same time.  One occurs and then some time
19  thereafter the other occurs.
20    Q.  And you said that because he didn't
21  complain of anginal pain?
22    A.  Right.
23    Q.  While in the water.
24    A.  Correct.
25    Q.  That that means what, please?

Page 41

1    A.  That I don't think he had -- well, I think
2  that makes it less likely that he had an acute
3  myocardial infarction.  So you asked me which I
4  think was more likely.
5    Q.  Yes.
6    A.  That's why I think something happened to
7  him suddenly.  Either that he drowned or he had a
8  primary -- I think those are the two most likely
9  causes of death, either he drowned or he had a
10  primary ventricular dysrhythmia.
11    Q.  Okay.  And if--
12    A.  Let me just if I may.
13    Q.  Please.
14    A.  When I say primary I would include those
15  secondary to ischemia.
16    Q.  Yes.  Ischemia being for us, please?
17    A.  Coronary ischemia.  Lack of blood flow.
18  Angina.  So not like free standing, just as likely
19  to.  So some people might consider and maybe this
20  technically would be correct.  Primary ventricular
21  dysrhythmia has nothing to do with the events that
22  you're experiencing, whereas the secondary could be
23  due to angina but not myocardial infarction.
24    Q.  Yes.
25    A.  And I would think the latter is what I'm

11 (Pages 38 to 41)

Page 58

1     A.  Okay.
2     Q.  But I would like to get it all in one
3  section if we can.
4         We talked about acute pulmonary embolism,
5  that that could have been an event that caused Mr.
6  Kane's death; correct?
7     A.  Yes.
8     Q.  Okay.  And Dr. Winters states that he was
9  noted to have clinical signs of an acute pulmonary
10  embolism by the NW MedStar advanced medical team.
11  Do you agree or disagree with that?
12    A.  Disagree.
13    Q.  Okay.  And on what basis do you disagree?
14    A.  I don't think that the observation that he
15  was cyanotic from his shoulders up indicates
16  anything.  I think that's helpful diagnostically.
17    Q.  Okay.
18    A.  Including pulmonary embolus.
19    Q.  And you agree with his statement that
20  certainly many diagnoses can cause sudden death with
21  the decedent's medical history?
22    A.  Yes.
23    Q.  Okay.  And that using that same
24  introductory sentence there he gives us a list that
25  we have mostly discussed.  I don't want to leave

Page 59

1  something out.
2         First, is it true -- to save a little bit
3  of time can we operate, and with your counsel's or
4  counsel for the plaintiff's approval, that I'm going
5  to go through this list.  And the questions really
6  about these are going to be, without having to
7  repeat this introductory sentence for each one of
8  these, is going to be can these -- could this have
9  been a cause of his death.
10    A.  Okay.
11    Q.  All right.  Fair enough?
12    A.  Yes.
13    Q.  So this will be a yes-or-no answer or
14  explanation as necessary, okay?
15    A.  Okay.
16    Q.  All right.  So the first is acute
17  pulmonary embolism due to limited movement; history
18  of previous multiple hip surgeries; hypertension;
19  obstructive sleep apnea as clinical challenges.
20    A.  Let me just stop you.
21    Q.  Yes.
22    A.  So due to lack of movement, is that the
23  end of the modifiers for acute pulmonary embolus?
24  Are there other risk factors?
25    Q.  Yeah, he included other risk factors as I

Page 60

1  read it.
2     A.  Okay.
3     Q.  First paragraph right there.  I'll read it
4  into the record.
5     A.  Right.  The one thing I would disagree
6  with there was so I don't think he had limited
7  movement.  I think being in a raft going down rapids
8  is not a risk factor for pulmonary embolus.
9     Q.  Okay.  But other than that, striking from
10  that the limited movement section of this paragraph
11  here, he could have had acute pulmonary embolism due
12  to history of previous multiple hip surgeries.
13  Correct?
14    A.  I don't know when those were done.  If
15  they were recent I'd say yes, but more than six
16  months I'd say no.
17    Q.  Okay.  Hypertension.
18    A.  Would not increase the risk of pulmonary
19  embolism. It might just be easier to say pulmonary
20  embolism.
21    Q.  And just leave it at that?
22    A.  Yeah, I don't think many of those factors
23  were necessarily risk factors for pulmonary embolism
24  but maybe are risk factors for sudden death.
25    Q.  Very good.  So these risk factors

Page 61

1  contained in that section beginning with acute
2  pulmonary embolism are risk factors to sudden
3  cardiac death but aren't necessarily all related to
4  acute pulmonary embolism.
5     A.  Some of them are.
6     Q.  Okay.  All right.  But I guess here's the
7  big point that I'm trying to make if it isn't
8  painfully obvious. Mr. Kane could have died from an
9  acute pulmonary embolism due to other factors.
10    A.  Yes.
11    Q.  Okay.  And other factors meaning other
12  factors than being immersed in the water.
13    A.  Other risk factors for pulmonary embolus.
14    Q.  Thank you.  And he could have -- well, I
15  think you perhaps agree here that he could have had
16  acute cardiac arrhythmia.
17    A.  Yes.
18    Q.  Or dysrhythmia.  So you and he agree on
19  that point.  As another cause of death he could have
20  had acute cerebral vascular accident, hemorrhage or
21  embolic clot or thrombotic.
22    A.  Yes.
23    Q.  Okay.  And that would mean, as I think
24  we've discussed, that that would be a CVA accident
25  in his brain caused by internal brain bleed,

16 (Pages 58 to 61)

Page 62

1  aneurysm, or a blood clot that passes to his brain.
2      A.   Yes.  And thrombosis means forms in situ
3  or in location.  It's thrombosis, not thrombotic.
4      Q.   Thank you.  Likewise he could have died
5  from acute cerebral aneurysm I think I've
6  mentioned now too many times.
7      A.   Yes.
8      Q.   Okay.  He could have died from acute
9  abdominal or thoracic aneurysm rupture.
10     A.   Yes.
11     Q.   He could have died from severe
12  intracranial traumatic hemorrhage.
13     A.   Yes.
14     Q.   He could have died from acute myocardial
15  infarction.
16     A.   Yes.
17     Q.   And then Dr. Winters says "It is unknown
18  why the decedent died."  Do you agree with that
19  statement?
20     A.   I'm not sure I understand it because I
21  think I have expressed my opinion as to what the
22  probable causes of death were.
23     Q.   Yes.
24     A.   Are we saying the definitive single cause
25  of death?  I think that is unknown.  But I think in

Page 63

1  terms of pathologic mechanism that I think the event
2  that led to his death was being ejected from the
3  raft under those conditions.
4      Q.   All right.
5      A.   And then what was the mechanism, I
6  mentioned either drowning or an infarction or a
7  cardiac dysrhythmia secondary to all the stress.
8      Q.   Yes.  And I think what Dr. Winters has
9  said is that with respect to your opinion that the
10  opinion is speculative in nature as to Mr. Kane's
11  cause of death.
12     A.   Just as a diagnosis is speculative.
13     Q.   Yes.
14     A.   Because, you know, we do this all the time
15  based on probability.
16     Q.   Yes.
17     A.   There's no definitive evidence of any
18  specific cause of death.
19     Q.   Okay.  Now, I understand that one of the
20  things you're looking at is that at one point in
21  time Mr. Kane is alive and in a raft and at another
22  point in time seconds later he is in the water.
23  Correct?  And that subsequent to being in the water
24  he is determined to be dead.
25     A.   Well, it's not that simple.

Page 64

1      Q.   Pardon me?
2      A.   It's not that simple.
3      Q.   Okay.  Please, go on.
4      A.   So he was alive.  He was energetic.  He
5  was participating.  He did not complain of symptoms.
6  He did not look like he was feeling ill.  He did not
7  suddenly sit down and stare off as if he was
8  suddenly very worried by some event that was
9  transpiring before he got ejected.  He was an
10  engaged, lively participant up until the moment he
11  was pitched from that raft.  And so all that, those
12  observations that were made would not support some
13  pathologic process occurring prior to him being
14  ejected from the raft, some significant pathologic
15  process.
16     Q.   Okay.  And the pathologic process that
17  we're speaking of would be a disease-type process;
18  correct?
19     A.   Some of the things you've listed there.
20     Q.   Some of the things we've listed there but
21  not all of the things that are listed.  Like by
22  example, as I've said and you've agreed, he could
23  have a brain aneurysm that just happens in a flash.
24     A.   Yes.
25     Q.   Okay.  And again, that cannot be ruled out

Page 65

1  as a cause of death based on the pathological data
2  in this case, or the lack of pathological data in
3  this case.
4      A.   Yes.
5      Q.   Okay.  Are there any other causes of death
6  for Mr. Kane that are not contained in your report
7  and that we have not discussed today that come to
8  your mind as we are having this conversation today?
9      A.   No.
10     Q.   Okay.  Your opinions with regard to the
11  cause of death of Mr. Kane as you've described
12  thoroughly in this deposition include probabilities
13  known to you.  Correct?
14         MR. BUCK:  I'm sorry, I didn't hear that.
15         MR. CRONIN:  Include probabilities known
16  to him.
17     Q.   Correct?
18     A.   Probabilities assessed by me?
19     Q.   Yes, whichever is--
20     A.   Yes.  And some of the literature.
21     Q.   Known in that you know that, you know, X
22  percent out of X percent of people who have this
23  die.  And assessed by you meaning you've reviewed
24  them and taken them into consideration in this case.
25     A.   Yes.

17 (Pages 62 to 65)