UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| THE ESTATE OF JOSEPH R. KANE, deceased; STACIE KANE, individually, and as guardian of JOSEPH P. KANE; and THOMAS KANE, individually,<br><br>    Plaintiffs,<br><br>vs.<br><br>EPLEY'S INC., an Idaho corporation,<br><br>    Defendant. | Case No.: 3:15-cv-00105-EJL-REB<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**PLAINTIFFS' MOTION TO AMEND COMPLAINT TO ASSERT PUNITIVE DAMAGE CLAIM**<br><br>**(Docket No. 17)**<br><br>**PLAINTIFFS' MOTION TO STRIKE DEFENDANT'S "SUR REPLY" TO PLAINTIFFS' MOTION TO AMEND COMPLAINT TO ADD PUNITIVE DAMAGES**<br><br>**(Docket No. 39)** |

Now pending before the Court is Plaintiffs' (1) Motion to Amend Complaint to Assert Punitive Damage Claim (Docket No. 17), and (2) Motion to Strike Defendant's "Sur Reply" to Plaintiffs' Motion to Amend Complaint to Add Punitive Damages (Docket No. 39). Having carefully considered the record, heard oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. BACKGROUND

Joseph R. Kane died after being ejected from a raft on a section of the Lower Salmon River known as "Slide Rapid." Mr. Kane was part of a Boy Scouts of America ("BSA") group, composed of minors and other adults – the majority of whom had no "whitewater" experience

MEMORANDUM DECISION AND ORDER - 1

whatsoever. The group booked their trip with Defendant Epley's Inc. ("Epley's"), a licensed outfitter in the state of Idaho that offers guided rafting tours on the Salmon River and Snake River.

Through this action, Plaintiffs (to include the estate of Mr. Kane, his wife Stacie Kane, and sons Thomas and Joseph P. Kane) claim that Epley's conduct – in particular, its decision to run the Slide Rapid at flows above 23,000 cubic feet per second ("cfs") – breached the standard of care applicable to outfitters and guides under chapter 12, Title 6, Idaho Code and that said breach was a direct and proximate result of Mr. Kane's death. *See generally* Pls.' Compl., ¶¶ 4.1-4.12 (Docket No. 1). Plaintiffs specifically allege:

> Defendant's conduct was wrongful and otherwise breached its standard of care by taking Joseph R. and Thomas down the river and through the Slide when they knew or should have known that the river's flow was in excess of 23,500 cfs, and knowing that these extreme conditions would produce incredibly dangerous Class V or Class VI rapids. Defendant's guides' decision to run these rapids not only ignored the rafter's inexperience, it was also contrary to the express written recommendations of the BLM's published handbook for rafting the Lower Salmon River. Defendant's actions were wrongful in the face of a known, significant risk that was unknown to the Plaintiffs.

*Id*. at ¶ 4.5. Since the action's inception, the above-referenced breach-of-the-standard-of-care allegations have further evolved into the bases for Plaintiff's at-issue Motion to Amend Complaint to Assert Punitive Damage Claim.[1]

According to Plaintiffs, Epley's not only ignored and misrepresented to the group the extreme risks presented by the water levels forecasted to be encountered at Slide Rapid on June

---

[1] Even so, these allegations were preliminarily tested in the context of Defendant's intervening Motion for Summary Judgment. *See* MSJ (Docket No. 16). U.S. District Judge Edward J. Lodge denied that Motion, concluding that questions of fact populated the interwoven issues of (1) the proper standard of care involved, (2) whether Defendant breached such standard of care, and (3) whether Defendant's conduct proximately caused Plaintiffs' injury and/or any actual loss or damage. *See generally* 12/6/16 MDO, pp. 16-30 (Docket No. 44).

**MEMORANDUM DECISION AND ORDER - 2**

27, 2014 (thus permitting the trip's June 24, 2014 launch in the first instance), its later decision to actually continue through Slide Rapid on June 27, 2014 at flows in excess of 23,500 cfs represented an extreme deviation from industry standards. *See generally* Mem. in Supp. of Mot. to Am., pp. 5-17 (Docket No. 17, Att. 1). Plaintiffs argue:

> Despite the dangerous conditions produced by the high flow levels, Defendant authorized the trip to commence as planned on June 24, 2014. Defendant's manager [(Blackner)] admits that he told the group that the river level would slacken by the time they reached the Slide on the fourth day of the trip, a fact admitted by Blackner and reflected in pre-trip emails by group members. Notably, Blackner told the group he expected the river would be down to 17,000 cfs by the time they hit the Slide. Blackner asserts he was relying on on-line river forecasts by the National Weather Service ("NWS") *vis-a-vis* [National Oceanic and Atmospheric Administration] ("NOAA") and [U.S. Geological Survey] ("USGS"), in making this claim.
>
> In fact, however, the water level forecasted by the NWS model as of the morning of the trip launch (June 24) for June 27 – the day the group was scheduled to hit the Slide – was not 17,000; it was approximately 21,000 cfs, Class V-VI water. Moreover, while earlier forecast modeling had predicted that the flow levels might recede below 20,000 cfs, the actual flow measurements taken by the . . . USGS show that the river had remained steadily above 23,000 cfs *for the four days before launch date*, flatly belying the earlier forecast models. Defendant's manager and guides were aware of this flow before the trip began. Moreover, rain was forecast for the area during the trip. <u>In short, there was no earthly reason to believe the water level would decrease significantly from the 23,400 cfs level on launch date by the time the Boy Scouts hit the Slide; all extant evidence and forecasts unequivocally established the Slide would be Class V water on June 27. Notwithstanding the extreme water level, the inexperienced, unfit passengers and the want of cause to believe the river volume would drop, Defendant launched the excursion</u>.
>
> <u>Prior to launch, the Defendant prepared no plan whatsoever to avoid or safely transit the Slid should the water level remain at ClassV level</u>. There were several options available. Defendant could have arranged to take the group off the river at Eagle Creek, the last overnight stop before the Slide. It could have arranged for a larger, motorized raft to transit the group. It could have arranged for jet boat transit at the Slide. Defendant took none of these prudent steps.
>
> On June 26,2014, the scout group landed and took out at Eagle Creek to spend the night. This was the group's last overnight location before reaching the Slide. Eagle Creek was also the last place where the group could have readily exited the river on

**MEMORANDUM DECISION AND ORDER - 3**

> land. The guides were aware that the river had not changed appreciably since the launch level of 23,400 cfs. Indeed, on the morning of June 27, after spending the night at Eagle Creek, Epley's guides could see with the naked eye that the river flow had actually increased overnight. Defendant's guides knew that these extreme flows would produce Class V or VI rapids at the Slide. <u>Despite this knowledge, prior to and after reaching Eagle Creek, the Defendant's agents made no plan to avoid the Slide in the event the water level did not recede, no plan to remove the group at Eagle Creek, and no plan to bring extra assets to the area of the Slide to relieve the obvious risk posed by the rapid.</u> The guides had access to a satellite phone, but they opted to not use it to verify water levels or explore options for avoiding the Slide, notwithstanding that it had "constantly" rained following the June 24 launch. . . . .

*Id*. at pp. 5-6 (internal citations omitted, italics in original, underlining added); *see also id*. at pp. 14, 16 ("Based on the evidence presented here, it can be inferred that Blackner intentionally or with gross negligence misled the group (and possibly his lead guide) to believe the Slide would be safely navigable by June 27. . . . . There [was] no rational justification for allowing this group to launch on June 24, other than for financial gain."); *id*. at p. 16 ("Simply put, once the group left on June 24, Epley's plan was to send the group through the Slide regardless of conditions, risk of injury or death to riders, or industry standards. . . . . The decision by the guides to authorize the trip to continue through the Slide after reaching Eagle Creek on June 26 also constitutes an extreme deviation from industry standards. The trip should have unquestionably been terminated when the guides recognized that the flows had not dropped since June 24.").[2]

---

[2] Plaintiffs also claims that Epley's use of inexperienced and inadequately trained guides contributes to the milieu of conduct auguring in favor of a punitive damages claim against Epley's. *See* Mem. in Supp. of Mot. to Am., pp. 14, 16 (Docket No. 17, Att. 1) ("There is no dispute that the guides selected by lead boatman Mike Cornforth for the trip had never transited the Slide at levels near 23,000 cfs. Accordingly, they lacked any training or experience whatsoever to manage the extreme conditions presented by the Slide at that level. . . . . Epley's decision to permit commencement of the trip on June 24, with minors as young as 14 and unfit 50-year-olds, at flows in excess of 23,000 cfs, under the supervision of inexperienced and unqualified guides, with no alternative safety plan in place, constituted an extreme deviation from the standard of care.").

**MEMORANDUM DECISION AND ORDER - 4**

Epley's disputes these claims outright, but alternatively argues that, even if true, they operate only to support claims that it was grossly negligent or reckless. *See generally* Opp. to Mot. to Am., pp. 12-19 (Docket No. 22). In short, attacking the *quantum* of Plaintiffs' proffered evidence, Epley's argues that, "[t]he mere fact of a tragic death during a high risk recreational activity does not create the necessary fraud, malice, outrage, or oppression" to warrant a claim for punitive damages. *Id*. at p. 12; *see also id*. at p. 15 ("Ultimately, even Plaintiffs' evidence regarding the water levels do not rise to any necessary level of proof that Epley's acted maliciously, outrageously, fraudulently, or oppressively."); *id*. at p. 17 ("The Plaintiffs' evidence fails to rise to the level of reasonable likelihood of proving fraud, oppression, malice, or outrage."); *id*. at p. 19 ("[Plaintiffs'] evidence in this motion at best claims that [Epley's] was grossly negligent or reckless, but nowhere explains or establishes fraud, oppression, malice, or outrage necessary to amend to add punitives.").

## II.  DISCUSSION

### A.  Punitive Damages: Legal Standard

Claims for punitive damages are governed by Idaho Code § 6-1604, which provides:

> In any action seeking recovery of punitive damages, the claimant must prove, by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted.

I.C. § 6-1604(1).

Whether to allow a claim of punitive damages is a substantive question controlled by Idaho law. *See Windsor v. Guarantee Trust Life Ins. Co.*, 684 F. Supp. 630, 633 (D. Idaho 1988). Ultimately, an award of punitive damages requires a bad act and a bad state of mind. *See Todd v. Sullivan Const. LLC*, 191 P.3d 196, 201 (Idaho 2008). The defendant must (1) act in a

**MEMORANDUM DECISION AND ORDER - 5**

manner that was an extreme deviation from reasonable standards of conduct with an understanding of – or disregard for – the likely consequences, and must (2) act with an extremely harmful state of mind, described variously as with malice, oppression, fraud, or outrageousness. *See Myers v. Workmen's Auto Ins. Co.*, 95 P.3d 977, 983 (Idaho 2004); *see also* I.C. § 6-1604.[3]

At trial, the party alleging punitive damages must satisfy this standard by clear and convincing evidence. *See* I.C. § 6-1604(1). However, for purposes of a motion to amend, the party seeking to add a claim for punitive damages does not need to meet this high burden; rather, the party need only show "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." *See* I.C. § 6-1604(2). Therefore, although FRCP 15(a) encourages the trial court to liberally grant motions to amend pleadings, this policy is substantially tempered by the requirements under Idaho law. That is, plaintiff may add a claim for punitive damages only if they establish a reasonable likelihood of proving, by clear and convincing evidence, that the defendant's conduct was oppressive, fraudulent, malicious, or outrageous.

Since plaintiffs are only required to demonstrate a "reasonable likelihood" of establishing their entitlement to punitive damages, on motions to amend to assert a claim for punitive damages under Idaho Code § 6-1604(2), courts apply the same standard it would apply in

---

[3] The Idaho Supreme Court has recognized that, since the enactment of Idaho Code § 6-1604 in 1987, gross negligence or deliberate or willful conduct is not sufficient for an award of punitive damages. *See Cummings v. Stephens*, 336 P.3d 281, 296, n.5 (Idaho 2014) ("Since the enactment of the statute, gross negligence or deliberate or willful conduct is not sufficient for an award of punitive damages."). Accordingly, the undersigned disagrees with Plaintiffs' to the extent they ask the Court to infer that a harmful state of mind can be satisfied by a defendant's gross negligence. *See, e.g.*, Mem. in Supp. of Mot. to Am., p. 10 (Docket no. 17, Att. 1); *compare with* Opp. to Mot. to Am., p. 10 (Docket No. 22) ("A party seeking punitive damages must prove defendant's action constituted an extreme deviation from reasonable standards of conduct, which was done with knowledge of the likely consequences, **and** an 'extremely harmful state of mind.' However, that 'extremely harmful state' can no longer be termed gross negligence or recklessness.") (internal citations omitted, emphasis in original).

**MEMORANDUM DECISION AND ORDER - 6**

resolving an FRCP 50 motion at the close of plaintiffs' case. *See Bryant v. Colonial Sur. Co.*, 2016 WL 707339, *3 (D. Idaho 2016). That is, evidence is viewed in the light most favorable to plaintiffs, with the benefit of all legitimate inferences without assessing credibility. *See id.* (citing *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009)).

It is in the trial court's discretion to decide whether to submit the punitive damages issue to the jury. *See Manning v. Twin Falls Clinic & Hosp., Inc.*, 830 P.2d 1185, 1190 (Idaho 1992). As a matter of substantive law, it is well established in Idaho that punitive damages are not favored and should be awarded only in the most unusual and compelling circumstances, and are to be awarded cautiously and within narrow limits. *See id.* at 1185; *see also Jones v. Panhandle Distribs., Inc.*, 792 P.2d 315 (Idaho 1990); *Soria v. Sierra Pac. Airlines, Inc.*, 726 P.2d 706 (Idaho 1986); *Cheney v. Palos Verdes Inv. Corp.*, 665 P.2d 661 (Idaho 1983); *Linscott v. Rainier Nat'l Life Ins. Co.*, 606 P.2d 958 (Idaho 1980).

**B.     Plaintiffs May Assert a Claim for Punitive Damages Against Epley's**

This lawsuit and the instant Motion to Amend are focused on the decisions surrounding the events leading up to June 27, 2014 – the day Mr. Kane, his son, and the rest of the rafters in their group encountered Slide Rapid. The evidentiary record about such decisions (viewed in light most favorable to Plaintiffs), gives rise to a reasonable likelihood of proving, by clear and convincing evidence, that Epley's engaged in a bad act, with a bad state of mind, so as to warrant a claim for punitive damages.

        1.     <u>Bad Act:  Extreme Deviation From Reasonable Standards of Conduct</u>

Plaintiffs point out that, in the days leading up to, and including, the June 24, 2014 launch, Defendant's manager and guides were aware that water levels on the Salmon River

**MEMORANDUM DECISION AND ORDER - 7**

consistently measured higher than 23,000 cfs and that, on June 24, 2014, the water level forecasted for June 27, 2014 (the day the group was scheduled to reach Slide Rapid) was approximately 21,000 cfs. *See* Mem. in Supp. of Mot. to Am., pp. 2-6, 11, 14 (Docket No. 17, Att. 1) (citing Ex. D (Blackner Dep. at p. 96) to Frey Decl. (Docket No. 17, Att. 3); Ex. F (Cornforth Dep. at p. 21) to Frey Decl. (Docket No. 17, Att. 3); Ex. L (USGS Discharge Data), to Frey Decl. (Docket No. 17, Att. 4); Ex. M (Northwest River Forecast Center ("NWRFC") River Flow Forecast), to Frey Decl. (Docket No. 24)).[4] Still, Epley's decided to proceed with the trip and, according to Plaintiffs, did so with "no plan whatsoever" to address the anticipated flow levels at Slide Rapid in the event water flow volumes remained dangerously high. *See* Mem. in Supp. of Mot. to Am., pp. 6-7, 15-16 (Docket No. 17, Att. 1) (citing Ex. D (Blackner Dep. at pp. 107-08) to Frey Decl. (Docket No. 17, Att. 3)).[5]

Flow levels did not appreciably change over the course of the trip and, on the morning of June 27, 2014, Defendant's guides could see that the river flow had actually increased overnight as the party camped at Eagle Creek (the last overnight location before reaching Slide Rapid). *See* Mem. in Supp. of Mot. to Am., p. 7 (Docket No. 17, Att. 1) (citing Ex. F (Cornforth Dep. at pp. 59-60) to Frey Decl. (Docket No. 17, Att. 3); Ex. G (Sharp Dep. at pp. 34-36) to Frey Decl.

---

[4] It is undisputed that, at levels over 20,000 cfs, Slide Rapid represents either Class V (expert) or Class VI (extreme and exploratory) waters. *See* Mem. in Supp. of Mot. to Am., pp. 4, 7, 14 (Docket No. 17, Att. 1) (citing Ex. B (BLM Guide) to Frey Decl. (Docket No. 17, Att. 3); Ex. D (Blackner Dep. at p. 86) to Frey Decl. (Docket No. 17, Att. 3); Ex. Q (Ranck Dep. at pp. 16-17) to Frey Decl. (Docket No. 17, Att. 6); Ex. E (Estes Dep. at pp. 18-19) to Frey Decl. (Docket No. 17, Att. 3)).

[5] According to Defendant's lead guide, Mr. Cornforth, "regardless of the height of the river when [the party] got to Slide [Rapid]," his only plan was "to try to stay river left and go through it." Ex. F (Cornforth Dep. at p. 22) to Frey Decl. (Docket No. 17, Att. 3).

**MEMORANDUM DECISION AND ORDER - 8**

(Docket No. 17, Att. 4); Ex. P (Sharp Witness Statement) to Frey Decl. (Docket No. 17, Att. 6)). Still, Defendant decided to proceed through Slide Rapid with allegedly unqualified guides, foregoing options to use an available satellite phone to discuss potentially safer options for the relatively inexperienced group, portage around Slide Rapid,[6] or altogether exit the river on land at Eagle Creek (the last place where the group could have readily done so). *See* Mem. in Supp. of Mot. to Am., pp. 6-7, 15-16 (Docket No. 17, Att. 1) (citing Ex. D (Blackner Dep. at p. 154) to Frey Decl. (Docket No. 17, Att. 3; Ex. F (Cornforth Dep. at pp. 22, 29-30) to Frey Decl. (Docket No. 17, Att. 3); Ex. O (Sears Expert Report, p. 6) to Frey Decl. (Docket No. 17, Att. 6); Ex. W (Nicolazzo Report, p. 3), to Frey Decl. (Docket No. 17, Att. ).

For its part, Epley's disputes Plaintiffs' contentions about forecasted flows for Slide Rapid in the days leading up to June 27, 2014, believing them to be lower. *See* Opp. to Mot. to Am., pp. 4-5, 14 (Docket No. 22) ("Despite Plaintiffs' incorrect assertions, the Northwest River Forecast website continued to predict that the Lower Salmon River water level would drop to below 20,000 cfs by the time the group was to reach the Slide.") (citing Ex. L (National Oceanic and Atmospheric Administration's National Weather Service, Northwest River Forecast Center River Flow and Stage Forecasts) to Cronin Decl. (Docket No. 22, Att. 3). Consistent with this, the BLM officials present at the launch site on June 24, 2014, neither warned the group not to

---

[6] Plaintiffs claim that another outfitter, Exodus River Adventures, ran the Lower Salmon River during the same time frame and, on June 26, 2014, portaged around Slide Rapid rather than running it at similar flows. *See* Mem. in Supp. of Mot. to Am., p. 7 (Docket No. 17, Att. 1) (citing Ex. D (Blackner Dep. at p. 154) to Frey Decl. (Docket No. 17, Att. 3)); but see Ex. Q (Ranck Dep. at p. 30) to Frey Decl. (Docket No. 17, Att. 6) (testifying that portaging Slide Rapid was not a viable option: "It is a steep slope with sharp rocks. Lots of ledges. Loose rocks. Having middle-aged parents. Some of which were overweight. They would have been more than capable to do so on maybe a beach or a smaller rock outcropping. But they wouldn't have been able to get safely over that rock slide by themselves. Especially carrying gear.").

**MEMORANDUM DECISION AND ORDER - 9**

go, nor stated any concern about the water levels whatsoever. *See* Opp. to Mot. to Am., p. 6 (Docket No. 22) (citing Ex. A (Blackner Dep. at p. 113) to Cronin Decl. (Docket No. 22, Att. 2). And, as to precautions taken before hitting Slide Rapid itself, Epley's notes that its guides (who it contends were state-licensed and experienced) conducted a safety talk on the morning of June 27, 2014 and, before reaching the rapids, pulled the group's rafts to shore to scout and pick the safest line to run – the "Sneak" down the left bank, with identified spots to "eddy out" at the bottom of the run "in case any individuals fell out during the rapid and they needed to perform a rescue." Opp. to Mot. to Am., pp. 6, 15-17 (Docket No. 22) (citing Ex. P (Ranck Dep. at pp. 29-31) to Cronin Decl. (Docket No. 22, Att. 3)).

The extent to which the parties' above-referenced arguments define the standard of care orbiting Defendant's actions leading up to Mr. Kane's death is clearly disputed. Judge Lodge stated as much when considering Defendant's Motion for Summary Judgment, discussing the relevant standard of care as follows:

> A question of fact exists, however, concerning what the standard of care is in this case; i.e., what ordinary care Epley's, as an outfitter, owed to Plaintiffs, as its customers/participants. The parties dispute the testimony of the expert witnesses offered to opine regarding the standards of the profession and the use/relevance of certain public information and industry publications to define the standard of care – in particular the standard of care in the profession for outfitters running the Slide Rapid above 20,000 cfs.
>
> Each sides' expert witnesses offer differing opinions concerning the standard of care applicable to the circumstances presented in this case. In his report, the Defendant's expert, Gary Lane, states that he used a 25,000 cfs cut-off for running commercial trips at the Slide Rapid but that "it has long been the standard practice and is the practice today for commercial outfitters on the Lower Salmon River to take commercial trips down the Lower Salmon, including the Slide Rapid, at flows up to and exceeding 25,000 cfs" and concludes that Epley's conformed to the standard of care expected of outfitters and guides rafter the Lower Salmon at the Slide Rapid with this group, gear, and at water levels higher than 20,000 cfs. Plaintiffs' expert, on the other hand, conclude the Defendant violated the standard of care with regard

**MEMORANDUM DECISION AND ORDER - 10**

>to running the Slide Rapid above 20,000 cfs under the circumstances of this case. Resolving the disputed questions presented by the experts' testimonies requires the weighing of evidence and credibility determinations which must be done at trial.

12/6/16 MDO, pp. 19-20 (Docket No. 44) (internal citations omitted).[7] And, whether these same arguments reflect Defendant's breach of any duty owed to Plaintiffs is also disputed, with Judge Lodge similarly ruling:

>For the same reasons discussed above with regard to duty, the Court finds a genuine issue of material fact exists as to whether Defendant breached the standard of care applicable in this case. This case presents the classic example of a battle of experts where both sides have presented contradicting testimony from experts concerning whether the Defendant breached a duty of care owed to Plaintiffs. Further, the facts surrounding events in question relevant to the breach issue are in dispute. For instance, the conditions presented on the day in question; what the guides knew regarding the water flow level of the Slide Rapid; whether there was a rescue plan and if that plan was followed; and any safety procedures in place and used by the guides. The jury, as the finder of fact, must consider all of the disputed facts, the credibility of the witnesses, and the weight of the evidence in order to determine whether Defendant breached its duty. Therefore, summary judgment is denied on this question.

*Id.* at p. 23.

Viewing the evidence in the light most favorable to Plaintiffs, and giving Plaintiff the benefit of all legitimate inferences without assessing credibility, Plaintiffs have established a reasonable likelihood of proving by clear and convincing evidence that Defendant acted in a

---

[7] Judge Lodge also considered the "public information and industry publications" for the purposes of determining the appropriate standard of care for Idaho outfitters running commercial trips on the Lower Salmon River generally, and when Slide Rapid experiences high flows. *See* 12/6/16 MDO, pp. 20-22 (Docket No. 44). This examination included the BLM's Lower Salmon River Boater's Guide, the American Whitewater Safety Code, outfitter websites, and industry blogs (including one by Defendant's expert, Gary Lane). However, they also didn't highlight the standard of care as a matter of law. *See id.* at p. 22 ("While these materials do not, in and of themselves, define the standard of care, and their admissibility and/or use at trial is not decided here, the materials do show a genuine issue of material fact is present in this case concerning the applicable standard of care.").

**MEMORANDUM DECISION AND ORDER - 11**

manner that was an extreme deviation from reasonable standards of conduct with an understanding (as an experienced outfitter) of – or disregard for – the likely consequences of those actions. *See, e.g.*, *Morningstar Holding Corp. v. G2, LLC*, 2012 WL 287517, at *14 (D. Idaho 2012) ("It is true that '[w]here evidence is conflicting, and where it can be said that if one theory of the case is correct there may be ground for the imposition of exemplary damages, the matter is properly submitted to the jury' to determine the correct theory.") (quoting *Williams v. Bone*, 259 P.2d 810, 813 (Idaho 1953)). As already indicated by Judge Lodge, it will be for the jury to resolve the issue of the actual standard of care involved and, relatedly, whether Epley's breached that same standard in the days and moments leading up to Mr. Kane's death. *See supra*.

      2.      <u>Bad State of Mind: Acting With An Extremely Harmful State of Mind</u>

Plaintiffs assert that Epley's, through its manager, Mr. Blackner, told Marelene Schaefer, who organized the event for the BSA, that (1) Defendant followed "BLM criteria" in determining whether to launch on the Lower Salmon Rive, and (2) they would not launch if the water was above 20,000 cfs. *See* Reply in Supp. of Mot. to Am., p. 2 (Docket No. 27) (citing Ex. B (Schaefer Dep. at pp. 25-28, 30) to Buck Decl. (Docket No. 21, Att. 3)). Plaintiffs also contend that Mr. Blackner assured Ms. Schaefer that he was monitoring river flows, even expressing concern that they might not be able to launch on the date planned and that they may have to "take an alternative trip if the water was over 20,000 cfs." *See* Reply in Supp. of Mot. to Am., p. 2 (Docket No. 27) (citing Ex. B (Schaefer Dep. at pp. 27-29) to Buck Decl. (Docket No. 21, Att. 3)).

But, according to Plaintiffs, at the June 24, 2014 launch Mr. Blackner did not tell Ms. Schaefer (who was also present with the inspection team at the launch) that the water level was

**MEMORANDUM DECISION AND ORDER - 12**

above 23,000 cfs, but did say that the water levels would be dropping to 17,000 cfs at Slide Rapid and, if they did not drop in time, they could alter the plan and take out at Eagle Creek or run a different route. *See* Reply in Supp. of Mot. to Am., p. 2 (Docket No. 27) (citing Ex. B (Schaefer Dep. at p. 46) to Buck Decl. (Docket No. 21, Att. 3);[8] Ex. D (Blackner Dep. at pp. 91-93) to Frey Decl. (Docket No. 17, Att. 3)). Mr. Blackner allegedly made these representations despite the fact that river level forecasts for June 27, 2014 (the day the group was scheduled to reach Slide Rapid) was, in reality, approximately 21,000 cfs. *See* Reply in Supp. of Mot. to Am., pp. 2-3 (Docket No. 27) ("Blackner admitted that he checked the USGS website that provided actual and forecasted river levels; consequently, he knew his statement that the river would be at 17,000 cfs by June 27 was false.") (citing Ex. D (Blackner Dep. at pp. 91-93) to Frey Decl. (Docket No. 17, Att. 3); Ex. M (NWRFC River Flow Forecast), to Frey Decl. (Docket No. 24)).

---

[8] Whether Ms. Schaefer actually understood if Defendant would either take out at Eagle Creek or cancel the as-planned trip altogether is unclear, with Ms. Schaefer testifying:

> Q: Okay. And that if [the river levels did not drop], according to what you've testified earlier, they could alter the plan and take out before they got to the Slide?
>
> A: Yes.
>
> Q: Okay.
>
> A: Well, their alternate plan was to run a different route, not to pull out before the Slide. There's a place to pull out I think.

Ex. B (Schaefer Dep. at p. 46) to Buck Decl. (Docket No. 21, Att. 3). Even so, the gist of this testimony is that Ms. Schaefer understood that, at certain flows, there would be no launch. *See id.* at p. 63 ("Well, I'm saying you saw where [Mr. Blackner] had an alternative if they could not launch and run the river the way that we had planned."). The Court understands that the alternative trip was from Vinegar Creek to Pine Bar. *See* Ex. D (Blackner Dep. at pp. 92-93) to Frey Decl. (Docket No. 17, Att. 3).

**MEMORANDUM DECISION AND ORDER - 13**

In other words, Plaintiffs argue that Mr. Blackner purposely misled Ms. Schaefer and, thus, the group by failing to inform them of actual (as of the June 24, 2014 launch date) and projected (for the anticipated encounter with Slide Rapid on June 27, 2014) river flows – that is, it was fraudulent and outrageous for Mr. Blackner to say that the forecasted flow for Slide Rapid on June 27, 2014 was 17,000 cfs, when, in actuality, it was much higher.

Again, Epley's takes issue with Plaintiffs' representation of what was actually forecasted for Slide Rapid as of June 24, 2014. *See supra*. Epley's does acknowledge the dueling factual accounts of what was said between Mr. Blackner and Ms. Schaefer surrounding the circumstances in which the group would (or would not) proceed with the as-planned trip, in the face of dangerous high river flow levels. *See* Reply in Supp. of MSJ, p. 3 (Docket No. 25) ("While it is disputed what Roger Blackner may have told Marlene Schaefer regarding what level he would run the Slide Rapid at prior to the June 24, 2014 trip, nothing that the Plaintiffs cite establishes that Roger, or any other Epley's personnel, testified the water was over the Epley's limit, or the industry standard.").

And, as before, such evidence and inferences must be viewed to Plaintiffs' benefit when considering Plaintiffs' efforts to amend their Complaint to assert a claim for punitive damages. When doing so, Plaintiffs have established a reasonable likelihood of proving by clear and convincing evidence that Epley's not only acted in a manner that was an extreme deviation from reasonable standards of conduct with an understanding of – or disregard for – the likely consequences of those actions (*see supra*), but also did so with a harmful state of mind when viewing Mr. Blackner's statements to Ms. Schaefer as fraudulent and/or outrageous. *See Morningstar*, 2012 WL 287517 at *14 (discussing role of jury to resolve conflicting evidence in

**MEMORANDUM DECISION AND ORDER - 14**

context of exemplary damages). Whether Epley's actually acted with such a harmful state of to support an award of punitive damages is therefore a question for the jury, and not the subject of this Memorandum Decision and Order.[9]

### III. ORDER

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Plaintiffs' Motion to Amend Complaint to Assert Punitive Damage Claim (Docket No. 17) is GRANTED; and

2. Plaintiffs' Motion to Strike Defendant's "Sur Reply" to Plaintiffs' Motion to Amend Complaint to Add Punitive Damages (Docket No. 39) is DENIED as moot.

DATED: **March 28, 2017**

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

---

[9] To be clear, the undersigned is granting Plaintiffs' Motion to Amend Complaint to Assert Punitive Damages Claim. However, the fact of doing so does not guarantee the claim will go to the jury. Judge Lodge will preside over the trial of the case and it will be within Judge Lodge's province to decide, after hearing the evidence, whether the jury should decide the issue of punitive damages at trial. *See, e.g.*, *Clark v. Podesta*, 2016 WL 4179851, at *8 (D. Idaho 2016) (Judge Lodge stating on that facts of that case: "It is premature for the Court to make a binding decision on punitive damages until the close of evidence. Only then can the Court determine if evidence has been presented that Podesta acted with the requisite state of mind to allow punitive damages to be considered by the jury. Accordingly, the Court will allow the motion to amend the Complaint but will reserve ruling on whether such claim will be decided by the jury. . . .").

**MEMORANDUM DECISION AND ORDER - 15**